No. 14228

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

EMIL WENZ, et al.,

Plaintiffs and Respondents,

-vs-

DIANE SCHWARTZE, et al.,

Defendants and Appellants.

---

Appeal from: District Court of the Ninth Judicia District,
Honorable Joel G. Roth, Judge presiding.

Counsel of Record:

For Appellants:

Smith, Emmons, Baillie & Walsh, Great Falls, Montana
James R. Walsh argued, Great Falls, Montana

For Respondents:

Marra, Wenz, Iwen and Johnson, Great Falls, Montana
Joseph Marra argued and Warren Wenz argued, Great Falls,
Montana
Carroll Blend argued, Great Falls, Montana

---

Submitted: May 4, 1979

Decided: AUG 1 1979

Filed: JUL 1979

Thomas J. Kearney
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

The District Court of Pondera County terminated the parental rights of a father and mother, both residents of California, and granted custody of their daughter to her aunt and uncle, residents of Montana. The father appeals.

The subject of this appeal is a minor child who was born in California in 1969. Her parents separated some eighteen months after her birth and obtained a final dissolution of marriage on January 13, 1972. The Los Angeles County Superior Court, in an uncontested proceeding, granted custody to the mother and allowed reasonable visitation to the father. It also ordered the father to pay weekly child support of $25 and to maintain medical and life insurance policies for his daughter's benefit.

Prior to the dissolution, the mother had separated from the father and had begun living with another man, alternatively known as Bridges, Martin, or Leonard. While the parents' living condition prior to their separation had not been ideal, the conditions under which the mother and child lived grew steadily worse in the company of Bridges. The mother, child, and Bridges lived in a variety of houses, and finally in a run-down apartment with little furniture, little food, and much questionable company.

As time went on and conditions worsened for the mother and child, the child's paternal grandmother, who lived in the area, became concerned for the child's welfare. She made frequent visits to the mother's apartment and often kept the child on weekends. In late 1973 after her mother and Bridges had moved into an apartment building in Venice, California, the child began relating information which caused her grandmother considerable concern. She described

in particular that her mother and Bridges had received, on occasion, hypodermic injections from some unknown man, and that she was unable to awaken her mother after she had received those injections. She also told how she had been repeatedly subjected to sexual abuse by Bridges. The grandmother testified that the child's complaints of abuse were ongoing and confirmed that the child had visible physical indications of abuse.

The grandmother shared this information with the child's father and his new wife. When questioned by the father, the child first refused to answer but later gave an affirmative response. She also responded positively to the father's new wife. The father next questioned the child's mother, who denied any such activities. His testimony indicates that he cannot remember whether he ever confronted Bridges with this information.

In November 1973 the father spoke to Jerome Kessler, an attorney in Los Angeles, about a change of custody. According to Kessler, the father said that his former wife "was a hippie who wanted to go on welfare" and the father "expressed an interest at some point obtaining custody of his daughter." Kessler told the father at that time that he doubted whether the father had ample grounds to obtain a modification of the decree.

The father again consulted Kessler in February 1974, and, according to Kessler, told him of at least one of the alleged incidents of abuse. Kessler testified that he informed the father that some form of proof would be necessary, and that a lawsuit to change custody would be difficult to maintain in the absence of an eyewitness to the mistreatment of the child.

A deposition by Linn Davis, a paralegal in Kessler's office, indicates that the father spoke with her on numerous occasions regarding a change of custody. However, her testimony indicates that the father's reasons for desiring custody remained general until the early part of 1975. "At first it was just an expression of desire for the child." In January or February, according to Davis, the father complained that his former wife was a "hippie, an irresponsible woman who did not seem to care about the suitability of the environment of the child." In February 1975 the father called to ask "'Can I get custody if [the mother] is smoking marijuana?'" According to Davis, it was March 1975 when the father first related anything to her about any alleged abuse of his daughter.

During the summer of 1974, the mother permitted the paternal grandmother to take the child to Oregon to stay at her ranch home there. In early July, however, in response to a request from the child's maternal grandmother in Billings, Montana, the child was put on a plane to Billings so she could spend part of the summer with her mother's relatives in Montana. When she arrived in Billings, the maternal grandmother noticed that the child's hair was matted with blood and pus around one ear. She had heard earlier from the other grandmother that the child had ear problems, but that the mother was unwilling to have the condition treated by a physician. The maternal grandmother obtained medical assistance for the child and by the time she returned to Los Angeles in August the condition, a bad infection, had cleared up.

The maternal grandmother accompanied the child on the return trip to Los Angeles and spent about three days in the

mother's apartment. During that visit she observed the deprived conditions under which her daughter and granddaughter lived. She also observed the father in the company of the mother and Bridges and noticed that the father appeared friendly toward Bridges.

The child remained in the mother's custody for the next several months, but her paternal grandmother continued to care for her on weekends. The grandmother testified that the child again complained of abuse by Bridges and that she kept the child as much as possible to keep her away from Bridges.

In May 1975 the paternal grandmother, who had remarried, prepared to move to Oregon with her husband. On May 12, shortly after she had left the child with her mother in Venice, she received a call from the mother who told her to come back and get the child "before [Bridges] kills her." When she arrived back at the mother's apartment, the child's clothing was all in the hallway, and the mother told the grandmother, "take her, she can't live with me. She can't live with [Bridges] and I any more." It appeared to the grandmother that Bridges had learned that the child had told about his abuse of her. She also testified that the mother referred to her child as a liar.

The grandmother and her husband kept the child for the next month as they prepared for an extended tour through the western states and Canada. They arrived at the residence of the child's aunt and uncle in Pondera County, Montana, on June 15, 1975, and there shared the full story of the child's life with her mother and Bridges. The child's aunt testified that when she and her husband heard the grandmother's story they were horrified and agreed with her that the child should not go back to her mother.

The aunt and uncle contacted the wife's cousin, an attorney in Great Falls, Montana, who agreed to come to their ranch to talk the situation over. At the attorney's request, the grandmother prepared a letter detailing all she knew of the child's situation, closing with a plea that someone would help her son, the father, gain custody of the child. The attorney then telephoned the father in California who told him that he was to meet with Kessler in Los Angeles the next day. According to an affidavit prepared by the attorney, he told the father that the child's aunt and uncle were considering filing for custody.

On the following day the grandmother and her husband left for Canada, leaving the child's clothing, medical records, and birth certificate with her aunt and uncle. The grandmother testified that she understood the child would be returned to her in Oregon after she got home from Canada. That same day the Great Falls attorney telephoned Kessler in Los Angeles and discussed the aunt and uncle's desire to keep the child away from her mother, and their doubts concerning the father's willingness or ability to care for the child. He learned from Kessler that the father had not yet filed for the child's custody and stated that Kessler told him that the father was not able to make up his mind about whether to seek custody.

The next day, June 18, the Great Falls attorney again called Kessler to inform him that the aunt and uncle had decided to seek permanent custody and that a complaint would be filed in Pondera County on June 20, when the child's maternal grandparents could come from Billings, Montana, to sign it. He further informed Kessler that the aunt and uncle would have a temporary custody and restraining order

-6-

issued to them at that same time.  The order granting temporary custody to the aunt and uncle was signed on June 19, 1975.

On June 19, 1975, the father, having been informed that an action was about to be filed in Montana, filed a separate action in Los Angeles County to have custody changed to himself, alleging that the mother was unfit because she had permitted the child to be abused.  He subsequently obtained a stipulation from the mother agreeing to a change of custody and on July 7 the Los Angeles County Superior Court granted custody to the father.

On June 24, 1975, the grandmother, father, and a friend of the father's appeared at the aunt and uncle's ranch in Pondera County and took the child away, intending to fly her back to California.  With the assistance of the sheriff, however, the aunt and uncle recovered the child that same evening.

Two years later, in August 1977, the Pondera County District Court, sitting without a jury, in Great Falls, heard oral and deposition testimony from the parties named in the aunt and uncle's custody petition.  Both the father and paternal grandmother appeared and testified, but the child's mother did not appear.  At the recommendation of a Great Falls clinical psychologist, the District Court did not ask the child whether she wanted to stay with her aunt and uncle or return to her father.  Her interests in the case were represented, however, by the Cascade County attorney.

Following the hearing the District Court ruled that the natural parents had abused and abandoned their child, ordered the termination of parental rights of both natural parents and awarded full custody of the child to her aunt and uncle.

It also appointed the aunt and uncle general guardians for the child for the duration of her minority.

The specific conclusions upon which the court relied in entering its orders were that the conduct of the natural parents constituted abuse and abandonment of their minor child, and that this conduct rendered them "unfit to have or regain" the "care, custody, and control" of her. Further the court concluded that the best interests of the child required that she be "free from the dominion" of her parents and placed in the full and complete care of her aunt and uncle.

The District Court made lengthy and detailed findings concerning the circumstances under which the child had been raised during her first five years. In particular, these findings focus on the activities of the father during the time his daughter lived in Los Angeles County. These findings show that the father had not sought custody when his marriage was dissolved despite his knowledge of his wife's relationship with Bridges, of his wife's and Bridges' use of drugs, and of his wife's apparent mental illness. They show that the father grossly misrepresented his assets at the time of the dissolution by declaring that property which he owned by inheritance was worth $1000, when in fact it had been appraised at $54,400 ten years earlier (and which he sold for $108,000 in 1973); that the California Superior Court ordered the father to pay his wife $25 per week in child support, but that he in fact paid only $30 for the support of his daughter from July 1, 1971 to January 1973, at which time he was ordered to appear in response to a contempt citation issued by the Los Angeles County Superior Court; that the father hired counsel to represent him at the

contempt hearing and obtained a reduction of his support obligation to $66 per month, commencing December 1, 1973, while in the meantime he had sold his inherited property, and after distributions to other heirs received $99,400 in cash on August 30, 1973; that the father continued to neglect his reduced support obligation and was again cited for contempt and ordered to appear in February 1975; that the father meanwhile purchased a home for $38,000 and remodeled it, and did "little in the way of serious employment" despite the fact that he declared himself to be a musician and photographer; that his actual annual income, except for the year in which he sold his inherited land, has never exceeded $4,000; that the father knew as early as February 1974 that his daughter had reported to her grandmother that she had been sexually molested by Bridges, that she had observed her mother and Bridges being injected with hypodermic needles, that she was living in filthy conditions, but that despite this knowledge he failed to either pay his "minimal" support obligation or to commence proceedings to regain custody; that it is incredible that the father would doubt his daughter's truthfulness when she "described in detail" the unnatural sexual acts which she had been compelled to endure; that the father failed to commence any proceedings on behalf of his daughter until she was outside of California, and then only after he had been informed that the aunt and uncle intended to commence such an action; that the evidence showed that the father had talked to two lawyers about the possibility of gaining custody of the child, but that he had not made up his mind to do so until informed of the Montana action; and finally, that when he did at last commence an action, he relied entirely upon evidence of sexual molestation of which he had known for at least sixteen months.

On the other hand, the court relied upon the testimony of the psychologist and others in finding that during the two years prior to trial, the child had lived with her aunt and uncle and had become well adjusted to her circumstances and that her condition had changed from a nervous, hyperactive and anxious child to a secure and comfortable child. It found specifically that the aunt and uncle are fit and proper persons to be awarded custody.

Finally the court found that the natural father had never had a "viable parent-child relationship" with his daughter.

Three principle matters must be decided on this appeal:

1. Did the Montana District Court have jurisdiction to modify an extant California decree?

2. Did the evidence presented to the District Court support its determination that the child was abused and abandoned by both parents?

3. Did the District Court have jurisdiction to name the child's aunt and uncle general guardians of the child?

The first issue is technically complex. It involves the effect of plaintiffs' failure to obtain personal service of process on the father; the effect of the father's appearance in the Montana proceeding; the effect of the ex parte proceeding by which the father obtained a modification of custody in the California Superior Court; the effect of Montana's enactment of the Uniform Child Custody Jurisdiction Act during the pendency of these proceedings; and finally, the effect of the full faith and credit clause of the United States Constitution. We hold that the District Court had jurisdiction to modify the California decree.

Personal Jurisdiction Over the Father.

The District Court, on July 1, 1975, obtained personal jurisdiction over the mother and Bridges by personal service of process in California. Efforts by the Los Angeles County sheriff's department to serve process on the father were unsuccessful. Thus, the father contends that he was not subject to the District Court's jurisdiction. He contends further that his appearance at the hearing on plaintiffs' petition did not serve to confer the court with in personam jurisdiction over him.

Montana's Rule 4B(2), M.R.Civ.P., which has no counter-part in the federal rules of civil procedure provides that a court obtains in personam jurisdiction over a person when that person voluntarily appears:

> "Jurisdiction may be acquired by our courts over any person through service of process as herein provided; or by the voluntary appearance in an action by any person either personally, or through an attorney, or through any other au-thorized officer, agent or employee." (Emphasis added.)

Additionally, courts and commentators are quite willing to distinguish child custody cases in which courts act as arbiters between disputing parents from dependent and neglect and abuse cases when the court stands as parens patriae seeking to assist the welfare of the abused, abandoned, or neglected child. H. Clark, Law of Domestic Relations, §18.2 at 610-11 (1968); Hazard, May v. Anderson: Preamble to Family Law Chaos, 45 Va.L.Rev. 379, 398, 404 (1959); Currie, Justice Traynor and the Conflict of Laws, 13 Stan.L.Rev. 719, 768 (1961). As declared by the Arizona Court of Appeals in a recent termination of parental rights decision:

> ". . .when the issue is primarily between the state in its parens patriae capacity and an ab-sent non-consenting spouse, the state is justi-

fied in providing for effective termination proceedings, even in the absence of in personam jurisdiction over a non-consenting parent." In Re Appeal in Maricopa County, Juvenile Action No. JS-734 (1975), 25 Ariz. App. 333, 543 P.2d 454, 459.

In light of the weight of authority, we must agree that personal jurisdiction over a parent is not necessary to the termination of his parental rights to a minor child, so long as the parent has actual notice of the termination proceedings or the District Court, under Rule 4D, M.R.Civ.P., makes an effort reasonably calculated to provide notice to the parent. See, Commissioners' Note, Uniform Child Custody Jurisdiction Act, Section 13, 9 Uniform Laws Annot. 121 (1973) ("Personal jurisdiction over the father is not required . . . The Act emphasizes the need for the personal appearance of the contestants rather than any technical requirement for personal jurisdiction."); Armstrong v. Manzo (1965), 380 U.S. 545, 549-50, 85 S.Ct. 1187, 1190-91, 14 L.Ed.2d 62, 65-66; Restatement (Second) of Conflict of Laws §69 (1971). In the case of out-of-state parents, see Section 5 of the Uniform Child Custody Jurisdiction Act, section 40-7-106 MCA.

Subject Matter Jurisdiction.

The father's second jurisdictional contention is that under the Uniform Child Custody Jurisdiction Act (UCCJA), sections 61-401 to -425, R.C.M. 1947, now sections 40-7-101 to -125 MCA, the California court, rather than the Montana court, had jurisdiction to determine the custody of his child. To consider this argument, it is necessary to examine the effect of the enactment of the UCCJA following the commencement of the aunt and uncle's action under section

-12-

61-111, R.C.M. 1947, now section 40-6-233 MCA, to terminate the parental rights of the natural parents.

This action was commenced on June 19, 1975, more than two years before the July 1, 1977, effective date of the UCCJA. The father contends that the Act must control the District Court's jurisdiction despite its later enactment, while the aunt and uncle citing section 12-201, R.C.M. 1947, now section 1-2-109 MCA, argue that the Act cannot be retroactively applied because it is substantive and does not, by its express terms, apply to actions which had already been commenced.

A nearly identical situation was recently considered in a New York UCCJA case, Pitrowski v. Pitrowski (1979), 412 N.Y.S.2d 316. The court described the changes set forth in its newly adopted UCCJA as procedural and acknowledged the general rule that such statutes are to receive retroactive application to actions commenced prior to the effective date of the statute. It reasoned, however, that "different considerations arise" if the question is whether the procedural changes embodied in the statute are to be applied to actions previously taken in the pending proceeding. The court held that in the absence of a clear legislative intent, the pre-UCCJA jurisdictional standards would apply to the court's preeffective date jurisdictional rulings:

> "'In other words, while procedural changes are, in the absence of words of exclusion, deemed applicable to "subsequent proceedings in pending actions " [citation omitted], it takes a "clear expression . . . of the legislative purpose to justify" a retrospective application of even a procedural statute so as to affect proceedings previously taken in such actions. [Citations omitted.]'" 412 N.Y.S.2d at 320, (quoting Simonson v. International Bank (1964), 14 N.Y.2d 281, 289-90, 200 N.E.2d 427, 432, 241 N.Y.S.2d 433, 440.) (Emphasis in original.)

Applying this principle to the present case, the jurisdictional rulings which the District Court entered prior to July 1, 1977, are not subject to the UCCJA. The requirements of the Act, however, are applicable to subsequent jurisdictional determinations including the District Court's ultimate determination that it had jurisdiction to modify the California custody decree.

While the District Court was not, as of the commencement of this proceeding, bound by the jurisdictional requirements of the UCCJA, it is nonetheless prudent to inquire whether the facts which existed on June 19, 1975, would have permitted the District Court to take jurisdiction of the case had the Act been effective on that date. If the facts as of that date would not have justified the assumption of jurisdiction, the court's ultimate custody order is not entitled to recognition and enforcement by other UCCJA states under Section 13 of the Act, section 40-7-114 MCA. In the present case, facts meeting the jurisdictional standards of the Act did exist on the date the action was filed.

The UCCJA attempts to avoid protracted interstate child custody litigation by reducing competition among courts which might otherwise issue conflicting custody orders:

> "The Act is designed to bring some semblance of order into the existing chaos. It limits custody jurisdiction to the state where the child has his home or where there are other strong contacts with the child and his family. See Section 3. It provides for the recognition and enforcement of out-of-state custody decrees in many instances. See Sections 13 and 15. Jurisdiction to modify decrees of other states is limited by giving a jurisdictional preference to the prior court under certain conditions. See Section 14. Access to a court may be denied to petitioners who have engaged in child snatching or similar practices. See Section 8. Also, the Act opens up direct lines of communication between courts of different states to prevent jurisdictional conflict and bring about interstate judicial assistance in

custody cases." Commissioners' Prefatory Note, Uniform Child Custody Jurisdiction Act, 9 U.L.A. 101 (1973). See also, Bodenheimer, Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modifications, 65 Cal.L.Rev. 978, 982-83 (1977).

The Act establishes a two-tiered jurisdictional test which a court must find satisfied before it makes even an initial custody decree, and a further jurisdictional test which limits a court's power to modify an out-of-state decree. It is the two-tier test that must first be examined. See, Note, 60 Minn.L.Rev. 820, 827-30 (1976).

The general jurisdictional provisions of the UCCJA are found in section 40-7-104 MCA, incorporating by reference section 40-4-211 MCA. This section details four separate bases of jurisdiction. The first is if this state is the child's home state or has been the home state within the six months prior to the commencement of the custody proceeding. Section 40-4-211(1)(a) MCA. "Home state" is defined as the state in which the child has lived with a parent or parents or someone acting in the capacity of a parent for at least six months. Section 40-7-103(5) MCA. Second, a court may have jurisdiction if it is in the best interests of the child to do so because the child and one or both of his parents (or contestants) has a significant connection with this state and because substantial evidence concerning the child's care, protection, training, and personal relationships is available here. Section 40-4-211(1)(b) MCA. Third, if the child is present in this state and has been abandoned or requires emergency protection because he has been threatened with mistreatment or abuse or is neglected or dependent, the court may take jurisdiction under the

ordinary _parens_ _patriae_ power.  Section 40-4-211(1)(c) MCA.

Fourth, a court is empowered to take jurisdiction if no

other state has jurisdiction under the first three grounds

or another state has refused jurisdiction and if it is in

the best interest of the child that the court do so.  Sec-

tion 40-4-211(1)(d) MCA.

The facts of this case indicate that the child had been

left in Montana because in May and June of 1975 she was not

wanted by either of her parents.  Her mother had explicitly

rejected her and her father, though professing a desire for

her presence and company, had permitted her to be left with

his former wife's relatives more than 1000 miles away.  He

had taken no action to gain his daughter's custody even

after his former wife had made it clear that the child could

not live with her and was in physical danger from her boy-

friend.  Section 40-4-211(1)(c) MCA provides:

> "A court of this state competent to decide child
> custody matters has jurisdiction to make a child
> custody determination by initial or modification
> decree if:
>
> ". . .
>
> "(c) the child is physically present in this
> state and:
>
> "(i) has been abandoned; or
>
> "(ii) it is necessary in an emergency to pro-
> tect him because he has been subjected to or
> threatened with mistreatment or abuse or is
> neglected or dependent."

The Commissioners' Note to this section describes it as

a retention and reaffirmation of _parens_ _patriae_ jurisdiction

but cautions that it is to be used only in "extraordinary

circumstances." 9 Uniform Laws Annotated 108 (1973).  See

also, Irene R. v. Inez H. (1978), 410 N.Y.S.2d 53, 55;

Bodenheimer, supra, 65 Cal.L.Rev. at 992-951; Foster and

Freed, Child Snatching and Custodial Fights: The Case for

the Uniform Child Custody Jurisdiction Act, 28 Hastings L.J. 1011, 1020-21 (1977). In view of the circumstances attending the child's presence in Montana in June 1975, we conclude that the District Court was justified in accepting jurisdiction. The facts at that time met the jurisdictional standards of section 40-4-211(1)(c) MCA, because the child was present in Montana, had been abandoned by both of her natural parents and had been subjected to and threatened with further mistreatment and abuse.

The second tier of the initial jurisdictional test is found in section 40-7-108 MCA, a complex section describing inconvenient forum considerations. This section authorizes a District Court to "decline to exercise its jurisdiction" any time before entry of a decree if it finds that it is an "inconvenient forum" and that a court of another state is a "more appropriate forum." The section describes several criteria by which a District Court may consider whether it is an inconvenient forum, but does not create a mandatory duty on the court to dismiss the action upon such grounds. The section is entirely discretionary. Thus, while the father contends that the Montana court was an inconvenient forum under the criteria of Section 7(c), section 40-7-108(3) MCA, the act specifically leaves the inconvenient forum determination within the full discretion of the trial court. We find no abuse of the trial court's discretion.

Jurisdiction to Modify the California Decree.

A second limitation on the District Court's jurisdiction arises when a decree of another state is already in force. In the present case, the California Superior Court had first granted custody to the child's mother. Then, by a

modification decree dated July 7, 1975, granted custody to the father. The father argues that the UCCJA and the full faith and credit clause prohibit a modification of the decree by the Montana court.

The United States Supreme Court has not ruled explicitly whether the full faith and credit clause applies to custody decrees. Past decisions of this Court, however, have treated the clause as a limitation on a Montana court's jurisdiction to modify custody determinations made by other states. Carroll v. White (1968), 151 Mont. 332, 443 P.2d 13.

While the United States Supreme Court has not specifically held whether the clause is applied in any custody cases, it has refused to apply it to particular cases in which the procedure in a state court was not considered adequate. Of particular relevance is Ford v. Ford (1962), 371 U.S. 187, 83 S.Ct. 273, 9 L.Ed.2d 240. In Ford a Virginia court awarded custody of children to their mother. Some months later the father petitioned the same court for a modification of the decree, but before the court entered judgment on his petition, the parties agreed to a modification and so notified the court, which dismissed the petition. Subsequently, the mother moved to South Carolina and petitioned a court of that state to regain custody of the parties' children. The father defended his custody on the basis of the agreement and the Virginia court's dismissal in response to that agreement. The United States Supreme Court held that the South Carolina courts were not bound by the dismissal of the Virginia petition for modification. In so ruling, the Court cited several considerations which are relevant here:

"The Virginia court held no hearings as to the custody of the children. In entering its order of dismissal, the court neither examined the terms of the parents' agreement nor exercised its own judgment of what was best for the children. The court's order meant no more than that the parents had made an agreement between themselves. . .

". . .

". . . we do not believe that, in view of Virginia's strong policy of safeguarding the welfare of the child, a court of that State would consider itself bound by a mere order of dismissal where, as here, the trial judge never even saw, much less passed upon, the parents' private agreement for custody and heard no testimony whatever upon which to base a judgment as to what would be best for the children." 371 U.S. at 193-94, 9 L.Ed.2d at 244-45, 83 S.Ct. at 276-77.

These same considerations are applicable here. While the Los Angeles County Superior Court at least appears to have viewed the substance of the stipulation between the natural parents, it is a matter of record that no hearing was held, the court heard no testimony regarding what would be best for the child, and therefore could not have exercised its own judgment of what was "best" for the child. Thus, because these were precisely the issues which the Montana court heard and decided, it is no more bound to follow the California court's decree than was the South Carolina court bound to follow the Virginia order in Ford.

Similarly, we conclude that the Montana court was not prevented from modifying the California decree by the UCCJA. A central purpose of the Act is to reduce interstate competition for a child's custody by requiring recognition and enforcement of one state's decrees by the courts of other states. However, before the recognition and enforcement provisions of the Act can be applied, the initial decree must be entered in conformity with strict notice requirements.

Section 13 of the UCCJA, section 40-7-114 MCA, provides

for the recognition and enforcement of out-of-state custody

decrees:

> "The courts of this state shall recognize and en-
> force an initial or modification decree of a
> court of another state which had assumed juris-
> diction under statutory provisions substantially
> in accordance with this chapter or which was made
> under factual circumstances meeting the juris-
> dictional standards of the chapter, so long as
> this decree has not been modified in accordance
> with jurisdictional standards substantially simi-
> lar to those of this chapter."

Section 14 of the Act, section 40-7-115 MCA, limits a

District Court's jurisdiction to modify the decrees of

another state:

> "(1) If a court of another state has made a
> custody decree, a court of this state may not
> modify that decree unless it appears to the
> court of this state that the court which ren-
> dered the decree does not now have jurisdiction
> under jurisdictional prerequisites substantially
> in accordance with this chapter or has declined
> to assume jurisdiction to modify the decree and
> the court of this state has jurisdiction.

> "(2) If a court of this state is authorized under
> subsection (1) and 40-7-109 to modify a custody
> decree of another state, it shall give due con-
> sideration to the transcript of the record and
> other documents of all previous proceedings sub-
> mitted to it in accordance with 40-7-123."

The difficulty with the application of these provisions

to the present matter arises from the failure of the Cali-

fornia Superior Court to comply with the notice provisions

of Sections 4 and 5 of the Act, sections 40-7-105 and -106

MCA.  See Cal.Civ.Code sections 5153, 5154.  Section 40-7-

105 MCA provides for notice to, among others, "any person

who has physical custody of the child":

> "Before making a decree under this chapter, rea-
> sonable notice and opportunity to be heard shall
> be given to the contestants, any parent whose
> parental rights have not been previously termi-
> nated, and any person who has physical custody
> of the child.  If any of these persons are out-
> side this state, notice and opportunity to be
> heard shall be given pursuant to 40-7-106."
> (Emphasis added.)

-20-

Section 40-7-106 MCA contains notice requirements when a person to whom notice and opportunity to be heard must be given is in another state. It requires such notice "at least 10 days before any hearing in this state."

"Strict compliance" with these provisions is essential to the validity of a decree:

> "Strict compliance with sections 4 and 5 is essential for the validty of a custody decree within the state and its recognition and enforcement in other states under sections 12, 13 and 15." Note, 9 Uniform Laws Annotated 110 (1973).

Yet in the present case, no notice or opportunity to be heard was ever given to the aunt and uncle who had physical custody of the child on June 19, 1975, when the father's modification petition was filed in the Los Angeles County Superior Court. The father acted quickly to obtain a modified order--only seventeen days after his petition was filed. There was no compliance with Sections 4 and 5. Thus, there can be no requirement of recognition and enforcement under Section 13.

A more difficult question arises under Section 14, which requires deference to the continuing jurisdiction of the court which first granted a custody decree. The central idea of that section is that once a state court has made a custody decree, that state retains an almost exclusive jurisdiction to modify the decree unless it (1) no longer has jurisdictional prerequisites "substantially in accordance" with the Act; or (2) has declined to assume jurisdiction to modify the/decree; and (3) the court of this state has jurisdiction. (See, Commissioners' Note to Section 14.)

In this case the initial custody decree granted the child to her mother. At that point California became the

"prior state" and petitions for modification were to be addressed to its courts, as was the father's petition. The father's petition, however, did not give the California court jurisdiction to modify the child's custody because of the failure to notify the persons who had physical custody of her. The father had a duty to notify the California court that persons not party to his action for modification had physical custody of the child, Section 9(a)(3) UCCJA, Cal.Civ.Code section 5158(1)(c), and that court was required to order those persons to be joined as parties and to notify them of the pending action. Section 10 UCCJA, Cal.Civ.Code section 5159.

The father has maintained throughout this action that the proper forum in which to hear the aunt and uncle's petition is the Los Angeles County Superior Court, yet he neglected the mandatory procedures by which the aunt and uncle would have been made parties to the California action which he commenced in 1975. Now he argues that the matter must be heard once again in California. We do not believe that the UCCJA requires such a result. Ordinarily if a state which has entered a decree still has jurisdiction under Section 3 of the Act, section 40-4-211 MCA, its courts must be looked to ahead of the courts of another state which subsequently gains jurisdiction. Thus, we must inquire whether California still has jurisdiction under Section 3. Plainly it does not have jurisdiction under Section 3(a)(1) because California is no longer the child's home state. Nor does it have jurisdiction under Section 3(a)(3) because the child is not present in California, or under Section 3(a)(4) because the Montana court has assumed jurisdiction under facts which meet Section3(a)(3). The only remaining section is 3(a)(2), section 40-4-211(1)(b) MCA:

"A court of this state competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

". . .

"(b) it is in the best interest of the child that a court of this state assume jurisdiction because:

"(i) the child and his parents or the child and at least one contestant have a significant connection with this state; and

"(ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships."

The Oregon Supreme Court recently considered whether the courts of Indiana were the more appropriate forum for resolution of a custody dispute under this section in a case in which Indiana had entered the first decree. The mother had secreted two children ages 4 and 8 away from their father who was still in Indiana. Some months after they had left Indiana, she petitioned an Oregon court for a modification of the Indiana decree. It was not until the children had been away from Indiana for eighteen months that the Oregon court heard the case. The Supreme Court observed that the passage of time had eliminated any "significant connection" with Indiana that the children had once had:

". . . at the time of the hearing by the trial court the children had no significant connection with Indiana because of the length of time they had been away. In the lives of children 4 and 8 years of age, 18 months is a long time." Marriage of Settle (1976), 276 Or. 759, 556 P.2d 962, 966.

In the present case the passage of time has created an identical loss of "significant connection" between the child and California. She was five years of age when she was left with her Montana relatives. Two years had passed by the time of the hearing, and nearly two more have since elapsed.

-23-

As the Oregon Supreme Court noted, jurisdiction under Section 3(a)(2) exists only when it is in the best interest of the child because the child and its parents have a significant connection with a state and there is "optimum access to relevant evidence." Settle, 556 P.2d at 966. See also, Commissioners' Note, 9 Uniform Laws Annotated 107-08 (1973). In this case there is neither. California does not now have jurisdiction under the Act and did not have jurisdiction at the time of the hearing in August 1977. Thus, the District Court was free to enter a new custody order.

The second principle issue raised by this appeal is whether the District Court abused its discretion by terminating the parental rights of the father and mother.

There is more than sufficient substantial, credible evidence to support the findings and judgment of the District Court in relation to the natural parents. The concern has been advanced that the father was not equally culpable. It is undisputed that he had misrepresented his assets to the Superior Court and thereby reduced his potential support obligation. It is a matter of record that the California court was forced to threaten the father with a contempt citation to induce him to provide for his child. These matters in themselves have not been thought to justify a termination of parental rights. See Matter of J.L.B. (1979), ___ Mont. _____, 594 P.2d 1127, 1135, 36 St.Rep. 896, 906-07. Nor may the abuse or neglect which the mother and her boyfriend may have shown be attributed to the father. Matter of T.E.R. (1979), ____ Mont. ____, 590 P.2d 1117, 1121, 36 St.Rep. 276, 281.

We find, however, two circumstances to be particularly supportive of the District Court's conclusion that the

father had neglected his minor child. First, the father failed to notify the juvenile authorities concerning the plight of his daughter. According to the father's mother, the child repeatedly complained of abuse by her mother's boyfriend over a period of at least one and one-half years. One of the attorneys consulted by the father, Mr. Gewirtz, advised him to notify the juvenile authorities, but the father did not.

Second, it is significant that in May 1975, when the mother forced the child out of her apartment, the child's paternal grandmother, not her father, took care of her. The evidence shows that the child's grandmother took the greatest interest in her while she was living with her mother. The grandmother, not the father, kept her at her home over many weekends. The District Court found specifically that the grandmother was the principle force behind the father's "belated attempts" to obtain custody of his daughter. It also found that no "viable parent-child relationship" has ever existed between the father and child.

We must measure these findings against some objective criteria to determine whether the father's conduct amounted to neglect and abuse of parental authority.

> "The abuse of parental authority is the subject of judicial cognizance in a civil action brought by the child or by its relative within the third degree or by the county commissioners of the county where the child resides. When the abuse is established, the child may be freed from the dominion of the parent and the duty of support and education enforced." Section 40-6-233 MCA.

In the absence of standards defining abuse in this section, we refer to the standards contained in Chapter 3 of Title 41 on child abuse, neglect, and dependency. Section 41-3-102(2) MCA provides:

"'Abuse' or 'neglect' means:

"(a) the commission or omission of any act or acts which materially affect the normal physical or emotional development of a youth. Any excessive physical injury, sexual assault, or failure to thrive, taking into account the age and medical history of the youth, shall be presumed to be nonaccidental and to materially affect the normal development of the youth.

"(b) the commission or omission of any act or acts by any person in the status of parent, guardian, or custodian who thereby and by reason of physical or mental incapacity or other cause refuses or, with state and private aid and assistance, is unable to discharge the duties and responsibilities for proper and necessary subsistence, education, medical, or any other care necessary for the youth's physical, moral, and emotional well-being."

We held in Matter of J.L.B., 594 P.2d at 1136, 36 St.Rep. at 908, that parental deficiencies by themselves, absent some harm to the child, are an insufficient basis upon which to terminate parental rights. In the present case the child was undoubtedly harmed, although not directly and solely by her father. Yet, he knew of his daughter's circumstances and did nothing to intervene on her behalf. A child in her position has a right to expect more. The father's argument that the courts of California would not modify the original custody without proof of the child's mistreatment wears thin in light of the father's failure to even notify the juvenile authorities that something was wrong. The father's attempt to blame the California court system for his own failure to seek aid for his child for more than a year will not suffice. The District Court concluded that the father had abused his parental authority by neglecting and abandoning his child under these circumstances. We do not find this to be an abuse of the District Court's discretion to weigh the evidence before it and arrive at a "clear and convincing" view of the facts. See Matter of J.L.B., 594 P.2d at 1136, 36 St.Rep. at 908-09.

The final issue presented is whether the District Court had authority to name the child's aunt and uncle as her general guardians. The father contends that the aunt and uncle's complaint did not specifically request the creation of a guardianship and therefore the District Court could not name them as guardians. We do not agree.

The complaint filed in this action sought: (1) To terminate the parental rights of the natural parents; (2) to award full care and custody of the child to her aunt and uncle; (3) to obtain a restraining order against the mother's boyfriend to prevent him from molesting the child; and, (4) for such other relief as the District Court deemed proper.

The District Court clearly had power to authorize a guardianship, the effect of which gives the court continuing supervisory authority over the aunt and uncle's care and provision for the child, under the fourth paragraph of the prayer for relief. Rule 54(c), M.R.Civ.P., provides in part:

> "Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

See, Smith v. Zepp (1977), ___ Mont. ___, 567 P.2d 923, 930, 34 St.Rep. 753, 762; 10 C. Wright & A. Miller, Federal Practice and Procedure, §2662 at 96-97.

The statute under which plaintiffs proceeded, section 61-111, R.C.M. 1947, now section 40-6-233 MCA, clearly gives the District Court jurisdiction to terminate parental rights:

> ". . . and when the abuse is established the child may be freed from the dominion of the parent . . ."

Upon the proper termination of parental rights, a District Court is empowered to name a suitable guardian of an unmarried minor. Section 72-5-222 MCA. See Guardianship of Aschenbrenner (1979), _____ Mont. _____, _____ P.2d _____, 36 St.Rep. _____ (No. 14610, decided July 16, 1979).

The judgment of the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____
_____
_____
Justices

-28-