923 So.2d 303 (2005)
J.D.
v.
TUSCALOOSA COUNTY DEPARTMENT OF HUMAN RESOURCES.
J.T.R.
v.
Tuscaloosa County Department of Human Resources.
Nos. 2030911 and 2030912.
Court of Civil Appeals of Alabama.
June 30, 2005.
Certiorari Denied August 19, 2005.
*304 Sandra C. Guin of Burroughs & Guin, LLP, Tuscaloosa, for appellant J.D.
Charles M. Coleman, Tuscaloosa, for appellant J.T.R.
Troy King, atty. gen., and J. Coleman Campbell, deputy atty. gen., and Elizabeth Hendrix and Lynn S. Merrill, asst. attys. gen., Department of Human Resources, for appellee.
Alabama Supreme Court 1041532.
BRYAN, Judge.
The Tuscaloosa County Department of Human Resources ("DHR") petitioned the Tuscaloosa Juvenile Court to terminate the parental rights of the mother and the putative *305 father of J.D. and E.D., two minor children. Following an ore tenus proceeding, the juvenile court entered judgments terminating the parental rights of the mother and the putative father. In these consolidated appeals, the mother, J.D., and the putative father, J.T.R., appeal those judgments. Although the mother concedes that the children were dependent, she argues that the juvenile court erred in finding that no viable alternative to termination of her parental rights existed. The putative father, a resident of Louisiana, argues that the juvenile court lacked in personam jurisdiction over him. We affirm.
Both of the children were born while the mother was living in Florida. The older child, a boy, was born in 1997, and the younger child, a girl, was born in 1998. The putative father was not living with the mother when either child was born, and the mother did not name him as the father of the children on their birth certificates. The mother and the putative father have never been married to each other, and the putative father has not been adjudicated the father of the children.
On March 4, 2002, DHR received a report that the mother, who was then living in Tuscaloosa, had left the children unattended while she went on a crack cocaine binge. DHR learned from the authorities in Florida and Louisiana, where the mother had lived before moving to Tuscaloosa in the fall of 2001, that the mother had overdosed on heroin in 2001. DHR learned from the putative father's parents, who lived in Louisiana, that the mother had temporarily delegated her parental rights to them after her heroin overdose in 2001 and, subsequently, had picked the children up at a day-care facility one day and disappeared without telling the putative father's parents where she was going.
When DHR could not find the mother on March 4, it picked up the children and filed dependency petitions with the juvenile court. After an emergency hearing, the juvenile court placed custody of the children with DHR while DHR attempted to rehabilitate the mother. DHR placed the children in foster care.
DHR required the mother to undergo a psychological evaluation. The evaluating psychologist opined that the mother suffered from a "rather severe untreated attention-deficit disorder." (DHR exhibit 14.) The psychologist stated that persons suffering from this disorder often attribute responsibility for their problems to others rather than to themselves and lack behavioral inhibitions.
DHR also required the mother to undergo outpatient treatment for substance abuse. After the mother satisfied DHR in August 2002 that she had complied with the conditions established by DHR for regaining custody of the children, DHR agreed to the juvenile court's returning custody to the mother subject to supervision by DHR, and the juvenile court did so. However, in early October 2002, the mother's boyfriend reported that she had left the children with him and disappeared. DHR picked up the children on October 2 and filed dependency petitions with the juvenile court that same day. After an emergency hearing on October 3, the juvenile court placed custody with DHR pending further review. DHR again placed the children in foster care.
The mother did not contact DHR until November 12, 2002. She was then undergoing treatment for a kidney infection and low potassium at Druid City Hospital. Although the mother initially claimed that she had been kidnapped and held against her will in an apartment for six weeks, she later told DHR that she had been in jail on a charge of possession of drug paraphernalia. *306 The mother told DHR that she was willing to undergo treatment for drug addiction; however, she subsequently failed to appear for several drug evaluations DHR had arranged at various drug-treatment facilities.
In January and February 2003, the mother was in and out of jail on charges of possessing drug paraphernalia and writing bad checks. The mother would not cooperate with DHR from March through August 2003. In July, the mother was incarcerated in jail again. In August, she was hospitalized for treatment of injuries she received when she was pushed out of a moving car.
On September 8, 2003, the mother underwent a drug evaluation. The mother told the evaluator that she had used alcohol and marijuana since age 12, that she had used cocaine since age 18, that she had used the narcotic Lorcet since age 26, and that she had used crack cocaine since age 28. She told the evaluator that she had used heroin in the past, although she was not using it then. She told the evaluator that she was then using cocaine and crack cocaine on a daily basis and using marijuana three to six times per week. The mother admitted that she had used illegal drugs when she had custody of the children from August 2002 to October 2002. The mother also told the evaluator that she was working as a prostitute to obtain drugs. The evaluator told DHR that the mother was in denial regarding her substance-abuse problem and that she blamed others for her problems. The evaluator recommended that the mother undergo 12 months of in-patient treatment for substance abuse and that she begin treatment immediately.
The mother had not visited the children after DHR picked them up the second time in October 2002. Although DHR petitioned the juvenile court to terminate the mother's parental rights on September 29, 2003, the mother still did not visit the children.
On September 23, 2003, the mother entered a facility for the treatment of her substance abuse; however, she left approximately a week later. Between October 31 and December 15, 2003, the mother's whereabouts were unknown to DHR. On December 15, DHR learned that the mother was in jail serving a 340-day sentence for writing bad checks. Her scheduled release date was November 16, 2004. When the hearing on the petition to terminate her parental rights concluded on June 21, 2004, the mother still had charges pending against her for theft and receipt of stolen property. The mother testified at the hearing on the petition to terminate her parental rights that she had made arrangements to begin in-patient treatment for substance abuse when she was released from jail. She testified that completion of this treatment would require a minimum of eight months. The children's foster parents testified that they were willing to provide the children with long-term care.
DHR was unable to communicate with the putative father until January 2003. The putative father told DHR that he had helped the mother move to Tuscaloosa in the fall of 2001 but had chosen not to have any contact with the children since then. He also told DHR that he had not paid child support or provided financial assistance for the children. DHR requested that the putative father come to Alabama to establish his paternity; however, he did not do so.
In April 2003, the putative father went to Tuscaloosa to visit the mother; however, he did not contact either DHR or the children's guardian ad litem. In June 2003, the putative father told DHR that he did not want custody of the children. He *307 agreed to come to Alabama in August 2003 for a paternity test, but ultimately he did not come to take the test. On September 29, 2003, DHR petitioned the juvenile court to terminate the putative father's parental rights. He was personally served with process on January 21, 2004, in Louisiana. The putative father did not contact DHR after he was served. The juvenile court appointed an attorney to represent the putative father, and the putative father's attorney asserted that the juvenile court lacked in personam jurisdiction over the putative father.
DHR investigated whether the children could be placed with the relatives of either the mother or the putative father; however, DHR could not locate a relative who was both willing and suitable.
The juvenile court received evidence ore tenus regarding the petitions to terminate the parental rights of the mother and the putative father on April 12 and June 21, 2004. On the basis of that evidence, the juvenile court expressly found, among other things, that the children were dependent, that the children had been abandoned by the mother and the putative father, and that no viable alternative to termination of the parental rights of the mother and the putative father existed. Consequently, the juvenile court terminated the parental rights of the mother and the putative father.

The Mother's Argument
Although the mother concedes that the children were dependent, she argues that the juvenile court erred in finding that no viable alternative to termination of her parental rights existed.[1] Specifically, she argues that, because the foster parents testified that they were willing to provide the children with long-term care, the juvenile court should have given her another chance to regain custody after she completes her jail sentence and in-patient substance-abuse treatment instead of terminating her parental rights. Citing V.M. v. State Department of Human Resources, 710 So.2d 915 (Ala.Civ.App.1998), the mother argues that her substance-abuse problem did not necessarily justify terminating her parental rights.
On appeal, this court will not reverse a juvenile court's judgment terminating parental rights unless it is so unsupported by the evidence that it is plainly and palpably wrong. M.H.S. v. State Dep't of Human Res., 636 So.2d 419, 421 (Ala.Civ.App.1994). The case now before us is factually distinguishable from V.M., supra. In V.M., although the mother had a history of substance abuse, she had been drug-free and alcohol-free for almost a year before the hearing regarding the termination of her parental rights. In the case now before us, on the other hand, the evidence established that the mother continued to use cocaine and crack cocaine on a daily basis and continued to use marijuana several times a week despite receiving treatment for substance abuse. She did not demonstrate that she could abstain from using illegal drugs. Therefore, we cannot hold that the juvenile court's finding that there was no viable alternative to terminating the mother's parental rights was so unsupported by the evidence that it was plainly and palpably wrong.

The Putative Father's Argument
The putative father argues that the juvenile court lacked in personam jurisdiction *308 over him because he did not have "minimum contacts" with the State of Alabama. See International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ("[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" (citations omitted)). While DHR concedes that the putative father did not have minimum contacts with the State of Alabama, it argues that the "status exception" to the minimum-contacts requirement allowed the trial court to adjudicate the putative father's parental rights with respect to these children even though he did not have minimum contacts with this state.
In State ex rel. W.A., 63 P.3d 607 (Utah 2002), the Utah Supreme Court held that the status exception to the minimum-contacts requirement applied to a termination-of-parental-rights proceeding. In that case, the child had been brought to Utah by his sister who then had temporary custody and guardianship of the child pursuant to an order of a Kentucky court. The sister subsequently informed the State of Utah that she could no longer care for the child. The State of Utah then brought a dependency proceeding in a Utah court. Adjudicating the child to be dependent, the Utah court awarded the State of Utah temporary custody and guardianship. Thereafter, the State of Utah and the child's guardian ad litem brought a proceeding in a Utah court to terminate the parental rights of the child's parents. The child's parents, who were both serving prison sentences in Oklahoma, did not have minimum contacts with the State of Utah. The parents challenged the in personam jurisdiction of the Utah courts to terminate their parental rights on the ground that they did not have minimum contacts with the State of Utah. After the trial court terminated the parents' parental rights, the mother appealed to the Utah Supreme Court. On appeal, the mother argued, among other things, that the Utah courts did not have in personam jurisdiction to terminate her parental rights because she did not have minimum contacts with the State of Utah. The Utah Supreme Court held that the status exception to the minimum-contacts requirement allowed the Utah courts to adjudicate the mother's parental rights even though she did not have minimum contacts with the State of Utah. Explaining its reasoning, the Utah Supreme Court stated:
"The United States Supreme Court has explained that the Due Process Clause of the Fourteenth Amendment to the United States Constitution permits a court to assert personal jurisdiction over a nonresident defendant where that defendant has `certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotations and citation omitted). An exception to this minimum contacts requirement exists, however. Indeed, the Supreme Court observed more than a century ago that cases involving the status of a plaintiff are unique and can be pursued in the plaintiff's home state even if that judicial forum does not have personal jurisdiction over the defendant. Pennoyer v. Neff, 95 U.S. 714, 734-35, 24 L.Ed. 565 (1877). In particular, the Court in Pennoyer stated the following:
"`To prevent any misapplication of the views expressed in this opinion [regarding the Fourteenth Amendment], it is proper to observe that we do not *309 mean to assert, by any thing we have said, that a state may not authorize proceedings to determine the status of one of its citizens towards a non-resident, which would be binding within the State, though made without service of process or personal notice to the non-resident. The jurisdiction which every State possesses to determine the civil status and capacities of all its inhabitants involves authority to prescribe the conditions on which proceedings affecting them may be commenced and carried on [in] its territory.'
"Id. at 734 (emphasis added).
"The Supreme Court reaffirmed the existence of the status exception in Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). There the Court explained that `Pennoyer itself recognized ... that cases involving the personal status of the plaintiff, such as divorce actions, could be adjudicated in the plaintiff's home State' despite the defendant's absence from the state. Id. at 201, 97 S.Ct. 2569. Importantly, the Court also noted that although an assertion of personal jurisdiction must ordinarily comply with the standard set forth in International Shoe, nothing in the Fourteenth Amendment `suggest[s] that jurisdictional doctrines ..., such as the particularized rules governing adjudications of status, are inconsistent with the standard of fairness.' Id. at 208 n. 30, 97 S.Ct. 2569 (citing Roger J. Traynor, Is This Conflict Really Necessary?, 37 Tex. L.Rev. 657, 660-61 (1959)).6 Thus, the Court has acknowledged that the status exception comports with due process requirements when properly applied even though the defendant lacks minimum contacts with the forum.
"Given that the United States Supreme Court has consistently recognized that certain types of cases involving status may not offend the Fourteenth Amendment, we must decide whether the status exception extends to parental termination proceedings. We conclude that it does for three reasons. First, parental termination proceedings clearly involve the determination of a child's status vis-a-vis its parents. See In re Interest of M.L.K., 13 Kan.App.2d 251, 768 P.2d 316, 319 (1989) (holding that the status exception extends to termination proceedings because the `[t]ermination of parental rights is nothing more than a determination of the legal status between the natural parent and the child'); In re M.S.B., 611 S.W.2d 704, 706 (Tex.Civ.App.1980) (declaring that `[i]t cannot be doubted that the parent-child relationship creates a status, and that a suit seeking to terminate such relationship is a status adjudication'). Second, such proceedings are `analogous to [a] court's termination of the marriage relationship between a husband and wife,' In re Interest of M.L.K., 768 P.2d at 319, and the Supreme Court has determined that the status exception applies to divorce proceedings, see Shaffer, 433 U.S. at 208 n. 30, 97 S.Ct. 2569 (citing Traynor, supra, at 660-61); Pennoyer, 95 U.S. at 734-35. Finally, although there is some authority to the contrary,7 the majority of jurisdictions addressing the issue have concluded that the status exception extends to parental termination proceedings. See In re Appeal in Maricopa County Juvenile Action No. JS-734, 25 Ariz.App. 333, 543 P.2d 454, 459-60 (1975); In re Interest of M.L.K., 768 P.2d at 319-20; In re J.J.C., No. E2000-01223-COA-R3-CV, 2001 WL 256161, at *1-2, 2001 Tenn. App. Lexis 171, at *3-5 (Tenn.Ct.App. 2001); Graham v. Copeland (In re Adoption of Copeland), 43 S.W.3d 483, 487 (Tenn.Ct.App.2000) (relying on status *310 exception in parental rights termination proceeding against a father in prison); In re M.S.B., 611 S.W.2d at 706. Cf. Wenz v. Schwartze, 183 Mont. 166, 598 P.2d 1086, 1091-92 (1979) (concluding personal jurisdiction over a parent is not necessary in order to terminate parental rights, without specifically discussing status exception), cert. denied, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980); In re A.E.H., 161 Wis.2d 277, 468 N.W.2d 190, 198-200, (focusing on child's contacts with the state in order to terminate parental rights), cert. denied, 502 U.S. 925, 112 S.Ct. 338, 116 L.Ed.2d 278 (1991).
"6 In his article, Judge Traynor wrote that special considerations surrounding the parent-child relationship `would normally preclude jurisdiction over a non-resident defendant having no contact with the forum state.' Id. at 661 (emphasis added). However, the sentence that immediately follows in Judge Traynor's article sets forth an exception to his assertion of normal preclusion:
"`Nevertheless, ... we must recognize that the state where a child is present must be competent to regulate his custody whether his parent is present or not, and if the parent cannot be found or has failed to discharge his parental obligations, that state, given the best notice reasonably possible, should be free to promote the interest of the child by permitting his adoption.'
"Id. at 662. Read in context, Judge Traynor's intended message regarding the assertion of jurisdiction over the parent-child relationship becomes clear. As the dissent in a recent Utah Court of Appeals case noted, the Shaffer Court, by `favorably citing to this article, ... appears [to have] contemplated that child custody adjudications, and more specifically termination proceedings, are included within the status exception.' E.A. v. State (State ex rel. W.A.), 2002 UT App 72 ¶ 48, (Bench, J., dissenting).
"7 Besides those cases ruling that personal jurisdiction could not be asserted over the nonresident parent due to lack of notice, see, e.g., In re One Minor Child, 411 A.2d 951, 952-53 (Del.1980), and those cases that conclude personal jurisdiction is lacking without discussing the status exception, see, e.g., D.L.C. v. C.A.H., 764 So.2d 562, 564-65 (Ala.Civ. App.1999), our research reveals only two cases that have declined to extend the status exception to parental termination proceedings: In re Doe, 83 Hawai`i 367, 926 P.2d 1290, 1299 (1996), and In re Vernon R.V., 128 N.M. 242, 991 P.2d 986, 988 ([N.M.Ct.App.1999])."
63 P.3d at 613-15.
We agree with the Utah Supreme Court that the status exception to the requirement that the defendant have minimum contacts with the forum state applies to termination-of-parental-rights proceedings, and we adopt the reasoning of that court quoted above.[2] Our conclusion that the status exception applies to termination-of-parental-rights proceedings renders the putative father's lack of minimum contacts with this state irrelevant. Nevertheless, we must still determine if the juvenile court's asserting in personam jurisdiction over the putative father in this case otherwise meets the due-process requirements of the Fourteenth Amendment. State ex rel. W.A., 63 P.3d at 616. We *311 conclude that it does for the following reasons.
First, the interests of this state are paramount to the interests of any other state. The children are presently residing in this state and have been since 2001. This state has an inherent interest in the welfare of children residing in this state. The information concerning the children's welfare, progress, needs, and potential adoptive family are more easily accessible in this state than in any other state. This state has been supporting the children since they were adjudicated dependent children in March 2002. Moreover, we are concerned that if we refuse to exercise authority over the children no other state will be able to assert jurisdiction to resolve their status due to their residence in this state. Therefore, this state's paramount interest in the outcome of this proceeding makes it appropriate for this state's courts to adjudicate it.
Second, "the maintenance of th[is] suit [in this state] does not offend `traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. at 316, 66 S.Ct. 154. This is not a case in which the mother brought the children to this state to interfere with the putative father's parental rights. Indeed, the putative father helped the mother bring the children to this state and voluntarily chose not to exercise his parental rights. Moreover, Alabama law has afforded the putative father sufficient procedural protection. He was afforded actual notice of this proceeding through personal service of process. Counsel was appointed to represent him in this proceeding. In addition, he was afforded an opportunity to summon witnesses, to introduce evidence, to cross-examine adverse witnesses, to have his rights fully and carefully considered by the juvenile court, and to appeal the decision of that court to this court. Those procedural safeguards adequately protected the putative father's Fourteenth Amendment due-process rights.[3]
Consequently, we conclude that the juvenile court's assertion of in personam jurisdiction over the putative father comports with the due-process requirements of the Fourteenth Amendment.

Conclusion
We affirm the judgments of the juvenile court terminating the parental rights of the mother and the putative father.
2030911AFFIRMED.
2030912AFFIRMED.
THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., concurs specially, with writing, which CRAWLEY, P.J., joins.
MURDOCK, Judge, concurring specially.
The main opinion concludes that the so-called "status exception" generally applies to termination-of-parental-rights proceedings. *312 I agree with this conclusion and with the reasoning by which the main opinion reaches it.
As the main opinion explains, however, the due-process inquiry does not end with the foregoing conclusion. Rather, the circumstances of every case must be examined to determine whether the state's assertion of jurisdiction over the parent-child relationship would "offend `traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In this regard, the main opinion first notes, and correctly so, that, under the circumstances presented in the present case, no other state has an interest in the welfare of the children comparable to the interest of the State of Alabama in their welfare. I write separately to add the observation that this is not a case in which there is any evidence that the putative father maintained a meaningful relationship with the children in some other state, or that the children were moved to Alabama in order to make it more difficult for the putative father to participate in the litigation of his status.
At least under the circumstances presented in this case, I conclude that it is not unfair or unjust to expect the putative father to defend against this action in Alabama.[4]
I also write separately to address the case of D.L.C. v. C.A.H., 764 So.2d 562 (Ala.Civ.App.1999), to which a reference is made in the main opinion. In D.L.C., this court held in a termination-of-parental-rights case that the Alabama juvenile court did not have jurisdiction over a father who did not have "minimum contacts" with this state. The main opinion in the present case, in my view, tacitly overrules D.L.C. Because the holding in D.L.C. is in conflict with our holding today, I believe it appropriate to, and that we should, expressly overrule it. The notion of a "status exception," first recognized in Pennoyer v. Neff, 95 U.S. 714, 734-35, 24 L.Ed. 565 (1877), and Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), was not discussed in D.L.C., and, for all that appears from this court's opinion in D.L.C., it was not argued by the parties.
CRAWLEY, P.J., concurs.
NOTES
[1] When a nonparent such as DHR seeks to terminate parental rights, it must establish by clear and convincing evidence not only that the children are dependent but also that no viable alternative to termination of the parental rights exists. J.W. v. Mobile County Dep't of Human Res., 677 So.2d 782, 783 (Ala.Civ. App.1996).
[2] As noted by the Utah Supreme Court in footnote 7 in State ex rel. W.A., we did not have occasion to consider the status exception in D.L.C. v. C.A.H., 764 So.2d 562 (Ala.Civ. App.1999).
[3] In State ex rel. W.A., the Utah Supreme Court stated:

"Cases dealing with status often involve a fundamental liberty interest. Nevertheless, the United States Supreme Court has allowed courts to exercise jurisdiction in such cases where standards of fairness are not violated. For instance, notwithstanding the fact that the right to marry has been deemed of `fundamental importance,' Zablocki v. Redhail, 434 U.S. 374, 384, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), the Supreme Court in Shaffer [v. Heitner] still recognized that it is appropriate for a state to exercise jurisdiction over a non-resident defendant for purposes of terminating a marriage, see 433 U.S. at 208 n. 30, 97 S.Ct. 2569 (citing Traynor, supra, at 660-61)."
63 P.3d at 617.
[4] As the main opinion notes, the only personal-jurisdiction argument made by the putative father on appeal is that federal constitutional due-process requirements have not been met. Nonetheless, it is worth noting that Rule 4.2, Ala. R. Civ. P., has consistently been held to "go to the full extent of federal due process." See Committee Comments to Amendment to Rule 4.2 Effective August 1, 2004.