FILED

08/16/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0441

DA 21-0441

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2022 MT 161

IN RE THE PARENTING OF: L.D.C.,

    A Minor Child,

VALERIE L. CALF BOSS RIBS,

    Petitioner and Appellant,

    v.

DANIEL J. CORNELIUS,

    Respondent and Appellee.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Glacier, Cause No. DR-18-15
Honorable Robert G. Olson, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Dawn Gray, Blackfeet Legal Department, Browning, Montana

        Kelly M. Driscoll, Attorney at Law, Missoula, Montana

    For Appellee:

        Joseph J. McKay, Attorney at Law, Browning, Montana

Submitted on Briefs:  February 23, 2022

Decided:  August 16, 2022

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1      Valerie L. Calf Boss Ribs (Mother) appeals the August 10, 2021, judgments of the Montana Ninth Judicial District Court, Glacier County, affirming the May 2021 Standing Master judgment amending the parties' parenting plan regarding the minor child (L.D.C.) and the related June 2021 Standing Master judgment denying Mother's subsequent motion to "transfer" jurisdiction to the Tribal Court of the Blackfeet Indian Tribe pursuant to §§ 40-7-202(1)(a), (b), and -108, MCA, of the Montana Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA).  We address the following dispositive issues on appeal:

1. *Whether the District Court Amended the Prior Parenting Plan Without Subject Matter Jurisdiction, or Improperly Exercised State Subject Matter Jurisdiction, vis-à-vis the Sovereign Jurisdiction of the Blackfeet Tribal Court?*

2. *Whether the District Court Erroneously Amended the Prior Parenting Plan Without the Showing of a Substantial Change in Circumstances Required by § 40-4-219(1), MCA?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      Mother and Daniel J. Cornelius (Father) are the birth parents of L.D.C., who was approximately three years old at the time of the underlying proceedings at issue.  Father resides in Wisconsin where he works as a farmer and is a member of the Oneida Indian Tribe.  Mother and L.D.C. are members of the Blackfeet Indian Tribe.

¶3      In January 2019, the District Court adopted and entered a final parenting plan pursuant to stipulation of the parties which essentially provided for them to co-equally

2

parent the child on an alternating month-to-month basis. At the time, Mother was living in Cut Bank, Glacier County, Montana. In mid-2019, the parties filed cross-motions for contempt of specified parenting plan provisions. In November 2019, the District Court, through its Standing Master, disposed of the cross-motions through a stipulated order that, *inter alia*, required Mother to submit to three random drug tests administered by a third-party provider on the Blackfeet Reservation in Browning, Montana. As reflected in the ensuing stipulated order, the parties' November 2019 stipulation also called for Mother to effect dismissal of a subsequently filed Blackfeet Tribal Court child custody proceeding regarding the child and to register the state court parenting plan orders in the Tribal Court "for enforcement only."

¶4 In October 2020, Father picked up L.D.C. from Mother in Browning. He did not return the child for Mother's next scheduled parenting time, however, and instead made multiple failed attempts to get Mother to submit to mediation. In February 2021, Mother responded by filing a new state court contempt motion against Father. He immediately filed a response in opposition and his own motion for amendment of the existing state court parenting plan.

¶5 At the ensuing state court hearing on May 17, 2021, Father testified to his various concerns regarding Mother's alleged substance abuse, non-compliance with various parenting plan provisions, her contraction of Covid-19 in regard to scheduled parenting time, and the severity of the Covid-19 outbreak on the Blackfeet Reservation. As additional justification for his failure to return L.D.C. to Mother, he cited national health

3

guidelines discouraging travel during the Covid-19 pandemic. In regard to his motion for a parenting plan modification, Father asserted that, as of January 2019, Mother had been temporarily staying at a multitude of places, been only intermittently employed, been difficult to contact due to her repeated phone number changes, and failed to keep him informed as required by the parenting plan. Father also testified that Mother called him at inappropriate times for harassing purposes, spoke of him in derogatory terms in front of L.D.C., failed to inform him of other people living in the home with her and L.D.C., failed to provide regular four-day-a-week phone contact with L.D.C., failed to return the child's clothing and personal effects when transferring custody, and refused mediation and third-party counseling—all allegedly in violation of the existing parenting plan.

¶6 Father further testified that, during telephone/video conferences with L.D.C., Mother was "not coherent," "clearly intoxicated or on drugs," had slurred speech, bloodshot eyes, and stumbled on words. He testified that in July 2019, as he was picking up L.D.C. from her, Mother "ripped" the child "out of [his] arms," avoided the responsive involvement of the Blackfeet tribal police, remained at large with the child without contacting him, and did not return the child until 30 days later. He testified to another similar incident that occurred in July 2020 in Browning when Mother entered his vehicle without permission and forcefully removed L.D.C. from his car seat, resulting in her arrest by the Blackfeet tribal police. Father described both incidents as "traumatic" to the child. Father's current girlfriend testified that she witnessed the July 2020 incident and corroborated Father's account. She also testified to witnessing Mother's slurred speech

and efforts to belittle Father during calls with L.D.C. The girlfriend testified that the child had "very negative . . . reaction[s] after these phone calls" and became highly agitated as a result of observing Mother "yell at his father in front of him."

¶7     Father's girlfriend further testified to L.D.C.'s positive development and enjoyment of life on Father's farm, where Father is teaching him the Oneida Indian language. Father ultimately moved the Standing Master to amend the parenting plan to require Mother to receive substance abuse treatment, at Father's expense. In that regard, he testified that although Mother had previously obtained a substance abuse report from a provider on the Blackfeet Reservation (Crystal Creek) opining that she did not need substance abuse treatment, she tested positive for methamphetamine use shortly thereafter. Mother testified at the hearing, and provided third-party witness testimony, in opposition to Father's motion and testimonial assertions.

¶8     On May 21, 2021, the Standing Master entered a written judgment amending the parties' parenting plan regarding L.D.C., along with a corresponding amended parenting plan.[1] The amended parenting plan largely adopted Father's proposed plan and placed L.D.C. exclusively in Father's custody and care, subject to Mother's specified visitation, until she:

> submits to a Chemical Dependency Evaluation by a Certified Chemical
> Dependency Counselor at a facility other than Crystal Creek Lodge, and that
> in the event that the evaluation comes back as having chemical dependency

---

[1] While not at issue on appeal, the Standing Master also found Father in contempt for failing to timely return L.D.C. to Mother for her allotted parenting time after October 2020.

issues, that [she] follows any and all recommendations resulting from the evaluation including but not limited to in-patient treatment.

In support of the amended parenting plan, the Standing Master found that Mother continued to engage in substance abuse, had been arrested following the violent July 2020 incident, and, in violation of the prior parenting plan, had refused mediation, failed to establish a permanent residence, maintain employment, and failed to maintain a consistent contact phone number since January 2019. The Standing Master thus found a substantial change in the circumstances of the child and that amendment of the prior parenting plan was in the best interests of the child.

¶9 That same day, Mother filed a state court motion for "transfer" of jurisdiction over the matter to the Blackfeet Tribal Court on the asserted grounds that the District Court lacked jurisdiction over her and the child and that Glacier County, Montana, was an inconvenient state court forum. On May 24, 2021, in conjunction with her state court motion to "transfer" jurisdiction, Mother filed a parallel child custody petition, and corresponding motion to accept jurisdiction, in the Blackfeet Tribal Court.

¶10 On June 11, 2021, the Standing Master issued a written order denying Mother's motion to "transfer" jurisdiction to the Blackfeet Tribal Court. On June 16, 2021, Mother filed an objection and motion for District Court review of the Standing Master's May 2021 parenting plan judgment and June 2021 denial of her motion to "transfer" jurisdiction to the Blackfeet Tribal Court. Following a hearing on July 8, 2021, and by separate written orders filed August 10, 2021, the District Court affirmed the Standing Master's May 2021 parenting plan judgment and subsequent June 2021 order denying Mother's motion to

"transfer" jurisdiction over this matter to the Blackfeet Tribal Court. Mother timely appeals.

**STANDARDS OF REVIEW**

¶11 We review lower court findings of fact only for clear error. *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, 53 P.3d 870. A finding of fact is clearly erroneous only if not supported by substantial evidence, the court misapprehended the effect of the evidence, or, based on our review of the record, we are definitely and firmly convinced that the lower court was otherwise mistaken. *Ray*, ¶ 19. We review lower court conclusions and applications of law de novo for correctness. *In re Marriage of Bessette*, 2019 MT 35, ¶ 13, 394 Mont. 262, 434 P.3d 894. We review lower court exercises of discretion for an abuse of discretion. *In re M.J.W.*, 1998 MT 142, ¶ 7, 289 Mont. 232, 961 P.2d 105. An abuse of discretion occurs if a court exercises granted discretion based on a clearly erroneous finding of fact, erroneous conclusion or application of law, or otherwise acts arbitrarily, without employment of conscientious judgment, or in excess of the bounds of reason, resulting in substantial injustice. *Bessette*, ¶ 13 (internal punctuation and citation omitted); *In re D.E.*, 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586 (internal citations omitted).

¶12 District courts may refer certain nonjury matters to an appointed standing master for adjudication. Sections 3-5-124 through -126, MCA; M. R. Civ. P. 53(a)(1)(A), (b)(2), and (c)-(e). On timely filed objection, the referring court shall review the subject standing master ruling for correctness. *See* § 3-5-126(2), MCA; M. R. Civ. P. 53(e)(2). Except to the extent that a court may take supplemental evidence in accordance with § 3-5-126(2),

7

MCA, and M. R. Civ. P. 53(e)(2), district courts review standing master findings of fact only for clear error. M. R. Civ. P. 53(e)(2); *In re G.J.A.*, 2014 MT 215, ¶¶ 17-19, 376 Mont. 212, 331 P.3d 835. In contrast, district courts review standing master conclusions and applications of law de novo for correctness, and master exercises of discretion for an abuse of discretion. *In re Marriage of Patton*, 2015 MT 7, ¶¶ 24-26, 378 Mont. 22, 340 P.3d 1242. Upon appeal of a district court ruling on review of a standing master decision where the court did not take supplemental evidence, the district court ruling is subject to review only for whether the court applied the correct standards of review to the standing master ruling. *Patton*, ¶ 17; *G.J.A.*, ¶ 11. We then review the standing master findings of fact only for clear error, master conclusions and applications of law de novo for correctness, and exercises of master discretion de novo for an abuse of discretion. *In re Marriage of Kostelnik*, 2015 MT 283, ¶¶ 15-16, 381 Mont. 182, 357 P.3d 912; *Patton*, ¶¶ 17-20.

¶13    Whether a district court lacked subject matter jurisdiction, whether directly or through its standing master, is a question of law subject to de novo review on appeal. *In re Estate of Big Spring*, 2011 MT 109, ¶ 20, 360 Mont. 370, 255 P.3d 121. We review a district court grant or denial of a motion to dismiss, or decision to decline or relinquish subject matter jurisdiction, due to inconvenient forum for an abuse of discretion. *In re Marriage of Stoneman*, 2003 MT 25, ¶ 10, 314 Mont. 139, 64 P.3d 997. We review a district court grant or denial of a motion to modify a parenting plan for an abuse of discretion under the standards specified in §§ 40-4-219 and -220, MCA, as applicable. *Bessette*, ¶ 13.

**DISCUSSION**

¶14    "Subject matter jurisdiction is the threshold authority of a court to consider and adjudicate particular types or classes of cases, controversies, or proceedings regardless of the procedural or substantive sufficiency of particular claims." *Gottlob v. DesRosier*, 2020 MT 210, ¶ 7, 401 Mont. 50, 470 P.3d 188 (citations omitted). "Subject matter jurisdiction is subject to challenge or review at any time on motion, or *sua sponte* by the court, and cannot be established or maintained by consent or waiver of the parties." *Gottlob*, ¶ 7 (citations omitted). On motion or *sua sponte* at any time in the proceeding or on appeal, actions, proceedings, and claims for relief are thus subject to prejudgment dismissal, and resulting judgments to invalidation, due to lack of subject matter jurisdiction. *See Gottlob*, ¶ 7 (internal citations omitted); *Big Spring*, ¶¶ 1, 8-9, 17-18, and 58-61 (reversing and remanding state law estate administration and exercise of probate jurisdiction over estate property held by deceased member of Blackfeet Tribe on Blackfeet Reservation).

    A. General State Law Child Custody Subject Matter Jurisdiction of Montana District Courts.

¶15    "The subject matter jurisdiction of Montana district courts derives exclusively from Article VII, Section 4, of the Montana Constitution and conforming statutes." *Gottlob*, ¶ 8 (citing *State v. Larson*, 2019 MT 28, ¶ 17, 394 Mont. 167, 434 P.3d 231; *Stanley v. Lemire*, 2006 MT 304, ¶ 52, 334 Mont. 489, 148 P.3d 643—punctuation altered). As pertinent here, Montana district courts have subject matter jurisdiction over "all civil matters and cases at law and in equity." Mont. Const. art. VII, § 4(1). *Accord* § 3-5-302(1)(b)-(c), MCA (district court jurisdiction over "all civil and probate matters" and "all cases at law

9

and in equity"). In pertinent part, except as otherwise more specifically limited by Montana statute, Mont. Const. art. VII, § 4(1), and § 3-5-302(1)(b)-(c), MCA, generally grant district courts subject matter jurisdiction to impose and modify child custody parenting plans in accordance with the substantive criteria of §§ 40-4-212 through -234, MCA.

B. State Law Limitation on Exercise of General Child Custody Jurisdiction of Montana Courts in Cases with Interstate Implications.

¶16  Upon initial enactment in 1975, the Montana Uniform Marriage and Divorce Act (UMDA)[2] included an isolated provision intended to limit the exercise of the otherwise broad child custody jurisdiction of Montana district courts in cases implicating overlapping or conflicting interstate child custody jurisdiction issues. *See* § 40-4-211(1), MCA (1975 Mont. Laws ch. 536, § 31, initially codified as § 48-331(1), RCM (1947) (specifying four alternative bases upon which district courts have subject matter "jurisdiction to make a child custody determination by initial or modification decree")); Code Commissioners' Note, § 40-4-211, MCA; Commission Comment, Uniform Marriage and Divorce Act (UMDA) § 401 (National Conference of Commissioners on Uniform State Laws (NCCUSL) 1973). As originally enacted and still today, § 40-4-211(1), MCA, provides that Montana district courts have subject matter "jurisdiction to make a parenting determination by initial or amended decree"[3] based on any one of four alternative relative

---

[2] See 1975 Mont. Laws. ch. 536, now codified at §§ 40-4-101 through -220, MCA, as amended.

[3] Consistent with the then-unenacted NCCUSL Uniform Child Custody Jurisdiction Act (UCCJA) § 2 (1968), 1975 Mont. Laws ch. 536, § 31(1) (formerly § 48-331(1), RCM (1947), and now § 40-4-211(1), MCA) originally referred to a "child custody determination by *initial* or *modification decree*," while § 40-4-211(1), MCA, now similarly refers without substantive change to a "parenting determination by *initial* or *amended decree*" as defined and referenced in

interstate jurisdictional criteria: Montana as the child's "home state"; the child and at least one parent or "contestant" "have a significant connection with this state" and substantial pertinent evidence is available herein; the child is "physically present" in Montana under certain circumstances; or "no other state has jurisdiction under" substantially similar statutory "prerequisites" or another state with jurisdiction "has declined to exercise [it]" on the ground that this state "is the more appropriate forum." Section 40-4-211(1)(a)-(d), MCA.

¶17 While it contemplated and recommended that states adopt the UMDA (NCCUSL 1973) in conjunction with the Uniform Child Custody Jurisdiction Act (UCCJA) (NCCUSL 1968), the NCCUSL provided for inclusion of UCCJA § 3 (four alternative interstate child custody prerequisites) as a stand-alone interstate child custody jurisdictional provision in the UMDA (UMDA § 401) in the event that a state chose to enact the UMDA without enactment of the companion UCCJA as recommended, to wit:

> The provisions of the [UMDA] concerning custody adjudication *are integrated with the provisions of the* [UCCJA (NCCUSL 1968)] . . . . The [UCCJA] deals with [subject matter] jurisdiction to adjudicate a custody case *when more than one state has an interest in the litigation.* [In contrast,] [t]he [UMDA] governs the substantive and procedural aspects of custody adjudication *once the court has decided that it can and should hear the case on the merits.* States considering the adoption of [the UMDA] should also consider adopting the [UCCJA]. If [the UCCJA] is adopted in the state, . . . [UMDA § 401(a)-(c)] *track*[*s*] *the interstate jurisdictional sections of* [UCCJA § 3(a)-(c) and] should be omitted . . . [from the UMDA enactment for that state].

---

§§ 40-7-103(3), (8), (11), -201(1), and -203(1), MCA, of the Montana UCCJEA, as enacted in 1999 Mont. Laws ch. 91 to replace the Montana UCCJA enacted in 1977 Mont. Laws ch. 537. (Emphasis added.)

11

Commission Comment, UMDA § 401 (NCCUSL 1973) (emphasis added). *See similarly* Code Commissioners' Note, § 40-4-211, MCA (verbatim excerpt from Commission Comment, UMDA § 401 (NCCUSL 1973)). *See also* UCCJA § 3(a)(1)-(4) (NCCUSL 1968) (identical statement of child custody jurisdictional prerequisites set forth in UMDA § 401(a)(1)-(4) (NCCUSL 1973)). Contrary to the contemplation of the NCCUSL, however, the Montana Legislature did not simultaneously enact the companion UCCJA with the UMDA, thus leaving the interstate child custody jurisdiction prerequisites now codified in § 40-4-211(1), MCA, isolated and unmoored from the provisions of the UCCJA to which the NCCUSL intended them to apply and interface with. The intended or effective consequences of § 40-4-211(1), MCA, as then unmoored from the UCCJA sections that defined and provided for its referenced terms *contestant*, *custody determination*, *custody proceeding*, *home state*, *initial decree*, *modification decree*, *state*, and inconvenient forum criteria, were thus unclear in light of the Legislature's failure to simultaneously enact the UCCJA or, alternatively, similarly define or provide for those terms as part of the 1975 Montana UMDA enactment. *See* § 40-4-211, MCA (formerly § 48-331, RCM (1947)). *Compare* UCCJA §§ 2 and 7 (NCCUSL 1973).

¶18 However, before arising or being implicated in any reported decision of this Court, that question became moot when the Legislature enacted the companion UCCJA (NCCUSL 1968) in 1977. *See* 1977 Mont. Laws ch. 537 (later codified in Title 40, chapter 7, MCA). Obviously aware that the UCCJA interstate child custody jurisdiction prerequisites in UCCJA § 3 (NCCUSL 1968) were already set forth in § 40-4-211(1), MCA

(1975), the Legislature did not redundantly include the identical UCCJA § 3 (1968) in its 1977 enactment of the UCCJA, but rather, expressly incorporated the preexisting § 40-4-211(1), MCA (1975), into the new Montana UCCJA by reference. *See* 1977 Mont. Laws ch. 537, § 4 (later codified as § 40-7-104, MCA (1977), "[t]he jurisdictional provisions of" § 48-331, RCM (1947) (now § 40-4-211, MCA), "apply to this act"). Consistent with the Legislature's manifest intent, we thus recognized that, though originally enacted and codified as part of the 1975 Montana UMDA, § 40-4-211, MCA, was, as of 1977, an integral and incorporated part of the new Montana UCCJA, to wit:

> The UCCJA attempts to avoid protracted interstate child custody litigation by reducing competition among courts which might otherwise issue conflicting custody orders:
>
>> [The UCCJA] is designed to bring some semblance of order into the existing chaos. It limits custody jurisdiction to the state where the child has his home or where there are other strong contacts with the child and his family . . . [and further provides for other referenced interstate child custody jurisdiction rules].
>
> Commissioners' Prefatory Note, Uniform Child Custody Jurisdiction Act, 9 U.L.A. 101 (1973).
>
> The [new Montana UCCJA] establishes a *two-tiered jurisdictional test* which a court must find satisfied before it makes even an initial custody decree, and a further jurisdictional test which limits a court's power to modify an out-of-state decree. It is the two-tier test that must first be examined.
>
> [Under the first tier,] [t]he general *jurisdictional provisions* of the UCCJA are found in section 40-7-104 MCA, *incorporating by reference* [§] 40-4-211, MCA[,] . . . [which] details four separate bases of jurisdiction.

*Wenz v. Schwartze*, 183 Mont. 166, 176-79, 598 P.2d 1086, 1092-93 (1979) (construing "the effect of the enactment of the UCCJA" and the "two-tiered" relationship between

13

§ 40-4-211, MCA, and the balance of the UCCJA provisions set forth in Title 40, chapter

7, MCA—emphasis added, some internal citations omitted).  We later similarly recognized

that:

> [§] 40-4-211, MCA, . . . is *incorporated into* the Montana [UCCJA] at
> [§] 40-7-104, MCA.

> .    .    .

> In *Wenz*[,] . . . this Court defined the scope of district court jurisdiction to
> modify a prior custody decree *with interstate implications*.  [The UCCJA]
> . . . establishes a two-tiered jurisdictional test which a court must find
> satisfied before it makes even an initial custody decree.

> The *first tier* of the *Wenz* test mandates that one of the four disjunctive
> requirements of [§] 40-4-211, MCA be satisfied before a district court may
> take jurisdiction to make a child custody determination.

> The *second tier* is found in [§] 40-7-108, MCA. . . . Further jurisdictional
> requirements arise when a decree of another state is already in force.

> .    .    .

> The *function of* [*§*] *40-4-211, MCA, on the other hand, is to actually confer
> subject matter jurisdiction* upon a district court to hear custody matters *with
> interstate implications*.  As the [NCCUSL] Commissioners explicitly state,
> [§] 40-4-211, MCA "governs jurisdiction to make an initial decree as well as
> a modification decree."  9 ULA 125 (Masters edition 1979).  In . . . cases
> *where a state other than Montana has a possible interest*, the jurisdictional
> requirements of [§] 40-4-211, MCA must be met before a court may assert
> "continuing jurisdiction" under [§] 40-4-219, MCA. This position is
> corroborated by the [Montana Code] Commissioners' Note to [§] 40-4-211,
> MCA:

>> The provisions of the [UMDA] concerning custody
>> adjudication are integrated with the provisions of the
>> [UCCJA]. . . . The [UCCJA] deals with judicial jurisdiction to
>> adjudicate a custody case when more than one state has an
>> interest in the litigation. The [UMDA] governs the substantive
>> and procedural aspects of custody adjudication once the court

14

> has decided that it can and should hear the case on the merits.
>
> 9A ULA 194 (Masters edition 1979).
>
> We find that [§] 40-4-211, MCA is the *premier jurisdictional hurdle* which must be overcome before a district court may modify a child custody decree *with interstate implications*.

*In re Marriage of Bolton*, 212 Mont. 212, 216-18, 690 P.2d 401, 403-04 (1984) (emphasis added, internal citations omitted, punctuation altered). *Accord In re Marriage of Alpert*, 258 Mont. 344, 347, 852 P.2d 669, 670 (1993) ("§ 40-7-104, MCA, . . . sets forth the UCCJA's jurisdictional requirements by incorporating the provisions of § 40-4-211, MCA"); *Pierce v. Pierce*, 197 Mont. 16, 20-21 and 24-26, 640 P.2d 899, 902-03 and 904-06 (1982) (citing and applying two-tiered *Wenz* UCCJA child custody jurisdiction analysis inclusive of § 40-4-211, MCA). Thus, upon enactment of the Montana UCCJA in 1977, § 40-4-211, MCA, was no longer an included provision of the UMDA, but rather, an integral and incorporated provision of the Montana UCCJA, distinct from the otherwise broad state law child custody jurisdiction granted by Mont. Const. art. VII, § 4(1), and § 3-5-302(1)(b)-(c), MCA, in regard to the substantive UMDA criteria for child custody determinations and modifications set forth in §§ 40-4-212 through -220, MCA.

¶19 In 1997, cognizant of the continued vexing problem of "interstate forum shopping," the NCCUSL promulgated the UCCJEA to: (1) eliminate "inconsistencies among state interpretation[s] and enforcement" that "hindered the purposes of the UCCJA"; (2) "provide[] clearer standards" for exercise of state child custody jurisdiction; (3) expressly provide for exclusive continuing jurisdiction over a court's prior custody

15

determination; (4) clarify the jurisdictional requirements for modification of a prior child custody determination made by a court of another state; and (5) "harmonize state child custody jurisdictional provisions with" the federal Parental Kidnaping Prevention Act of 1980 (PKPA), 28 U.S.C. § 1738A.[4] *See In re Marriage of Sampley*, 2015 MT 121, ¶¶ 23-24, 379 Mont. 131, 347 P.3d 1281; *Stoneman*, ¶¶ 12-14; Prefatory Note, UCCJEA (NCCUSL 1997). As pertinent here, the new 1997 UCCJEA deviated from the 1968 UCCJA insofar that it: (1) required enacting states to treat Indian tribes the same as other states; (2) modified the alternative threshold interstate child custody jurisdiction prerequisites for *initial* child custody determinations by "prioritiz[ing]" the "home State" as the preeminent interstate jurisdictional basis for those determinations; (3) modified the alternative "significant connection" jurisdictional basis for initial child custody determinations; (4) expressly provided for a state court's "exclusive, continuing jurisdiction" over its prior custody determinations; and (5) correspondingly marginalized the problem of simultaneous interstate proceedings. *See* UCCJEA §§ 104, 201, 202, and 206 (NCCUSL 1997) (including Prefatory Note and corresponding Commission Comments).

¶20 Accordingly, in 1999, the Montana Legislature acted to "Replac[e] The [UCCJA] With The [UCCJEA]." 1999 Mont. Laws ch. 91. While the Act did, in accordance with

---

[4] In pertinent part, the PKPA requires states, as a matter of federal law, to "give full faith and credit" to the child custody determinations of other states in accordance with specified notice and procedural provisions and further "authorizes continuing exclusive jurisdiction in the state that issued the original child custody decree so long as one parent or child remains there and the [subject] state has continuing jurisdiction under its own law." *Stoneman*, ¶¶ 12-13 (citing 28 U.S.C. § 1738A(d)).

its title, effectively replace the UCCJA with the UCCJEA, it did not simply repeal the preexisting UCCJA and enact the new UCCJEA in its place. Instead, the 1999 Act: (1) amended various provisions of the UCCJA to conform to corresponding provisions of the UCCJEA (1999 Mont. Laws ch. 91, §§ 4-13);[5] (2) added new UCCJEA provisions into the preexisting UCCJA statutory scheme (1999 Mont. Laws ch. 91, §§ 14-42 and 47);[6] (3) repealed various other UCCJA provisions including § 40-7-104, MCA (1999 Mont. Laws ch. 91, § 43); and (4) renamed the revised statutory scheme as the UCCJEA (1999 Mont. Laws ch. 91, §§ 1-3).

¶21     However, similar to the initial question in 1975 regarding the effect of the isolated provisions of § 40-4-211(1), MCA, resulting from the Legislature's failure to either simultaneously enact the companion UCCJA, or conformingly modify § 40-4-211, MCA, with its initial enactment of the UMDA, *see supra*, the 1999 repeal of § 40-7-104, MCA (incorporating § 40-4-211 into the UCCJA), without corresponding repeal or modification of § 40-4-211, MCA, to conform to UCCJEA § 201 (NCCUSL 1997), created a manifest incongruity, apparently unintended, between the old UCCJA interstate custody jurisdiction prerequisites still present in § 40-4-211, MCA (UCCJA § 3 (NCCUSL 1968)) and the revised standards set forth in the new § 40-7-201, MCA (1999) (UCCJEA § 201 (NCCUSL 1997)).[7] Due to the significant changes that distinguish UCCJEA § 201 (1997) (alternative

---

[5] *Compare* UCCJEA §§ 102, 107, 108, 111, and 206 through 210 (NCCUSL 1997).

[6] *Compare* UCCJEA §§ 103 through 106, 109, 110, 112, 201 through 204, 301 through 317, 401, and 402 (NCCUSL 1997).

[7] If it indeed had some reason for not similarly repealing § 40-4-211, MCA, with § 40-7-104, MCA (1977), of which none is apparent on the face of -211 or in legislative history of 1997 Mont. Laws

17

jurisdictional prerequisites for initial custody determinations) from UCCJA § 3 (1968), the Legislature's failure to repeal or conformingly amend § 40-4-211, MCA, as it did with other inconsistent provisions of the UCCJA again, as in 1975, leaves § 40-4-211 anomalously unmoored from, and thus in conflict with, the corresponding UCCJEA section, § 40-7-201, MCA (UCCJEA § 201 (NCCUSL 1997)), to which it should apply. *See* § 40-7-201, MCA (1999 Mont. Laws ch. 91, § 21); UCCJEA § 201 (1997) (including Comment). *Compare* § 40-7-104, MCA (1977 Mont Laws. ch. 537, § 4), *with* § 40-4-211, MCA (1975 Mont. Laws ch. 536, § 31) (including Code Commissioners' Note), UMDA § 401 (1973), *and identical* UCCJA § 3 (1968) (including Comment). *See also Alpert*, 258 Mont. at 347, 852 P.2d at 670; *Bolton*, 212 Mont. at 216-18, 690 P.2d at 403-04; *Pierce*, 197 Mont. at 20-21 and 24-26, 640 P.2d at 902-03 and 904-06; *Wenz*, 183 Mont. at 176-79, 598 P.2d at 1092-93. While the Legislature or this Court will eventually have to deal with the manifest anomalous discrepancy between § 40-4-211(1), MCA (now-superseded UCCJA interstate jurisdictional prerequisites), and § 40-7-201, MCA (new UCCJEA prerequisites), on another day, § 40-4-211, MCA, nonetheless remains as part, albeit an anomalous part, of the UCCJA/UCCJEA statutory scheme revised by 1999 Mont. Laws ch. 91, which imposes state law limits on the general child custody jurisdiction otherwise granted to Montana district courts in regard to the substantive UMDA criteria

---

ch. 91, the Legislature could have alternatively amended § 40-4-211, MCA, to conform to the UCCJEA section enacted in 1997 Mont. Laws ch. 91, § 21 (UCCJEA § 201 (1997), now codified as § 40-7-201, MCA), as it did with other sections of the preexisting UCCJA in 1999 Mont. Laws ch. 91, §§ 4-13 (§§ 40-7-103, -105 through -110, -112, -119, and -125, MCA).

for child custody determination and modification specified in §§ 40-4-112 through -234, MCA.

¶22 Recognition of the UCCJEA, including § 40-4-211, MCA, as a distinct state law limitation on the general state law child custody subject matter jurisdiction otherwise granted to Montana district courts, is critically important in regard to conflicts between the state law child custody jurisdiction of Montana courts vis-à-vis the independent sovereign child custody jurisdiction of federally-recognized Indian tribes[8] over member Indian children and parents.[9] While the UCCJEA requires that Montana district courts treat Indian tribes as "state[s]" for purposes of applying the UCCJEA's limitations on the exercise of state child custody jurisdiction, the state law UCCJEA neither grants, nor limits, the existence or exercise of the sovereign child custody jurisdiction of Indian tribes. *See* § 40-7-135(2)-(3), MCA ("a court of this state shall treat a tribe as if it were a state of the United States *for the purpose of applying*" referenced state law UCCJEA provisions—

---

[8] *See* § 41-3-102(15), MCA (defining "Indian tribe," *inter alia*, as any "band, nation, or other organized group or community of Indians recognized by . . . the United States secretary of the interior as being eligible for the services provided to Indians or because of the group's status as Indians, including any Alaskan native village as defined in federal law"); § 25 U.S.C. § 1903(3) and (8) (defining "Indian" as "any person who is a member of an Indian tribe" and "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary [of the Interior] because of their status as Indians"); *Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs*, 84 Fed. Reg. 959, 1200-05 (Feb. 1, 2019).

[9] *See* § 41-3-102(12), MCA (defining "Indian child" as any "any unmarried person who is under 18 years of age and who is either . . . a member of an Indian tribe . . . or eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe"); 25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either . . . a member of an Indian tribe or . . . is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

emphasis added); Commission Comment, UCCJEA § 104 (NCCUSL 1997) (UCCJEA "does not purport to legislate custody jurisdiction for tribal courts"). *See also In re Marriage of Skillen*, 1998 MT 43, ¶¶ 16 and 31, 287 Mont. 399, 956 P.2d 1, *overruled in part on other grounds by Big Spring*, ¶ 45.

    C. Exclusive Child Custody Jurisdiction of Indian Tribes as a Matter of Federal Law and/or Residual Tribal Sovereignty.

¶23    As recognized by the Supreme Court in noting the current legal status of American Indian Tribes:

> Originally the Indian tribes were separate nations within what is now the United States. Through conquest and treaties they were induced to give up complete independence and the right to go to war in exchange for federal protection, aid, and grants of land. When the lands granted lay within States th[o]se governments sometimes sought to impose [state] laws and courts on the Indians. . . . [However, federally-recognized Indian] nations[s] [are] distinct communit[ies], occupying [their] own territor[ies] in which [state] laws . . . can have no force . . . but with the assent of the [Tribes] themselves, or in conformity with treaties, and with the acts of Congress. The whole intercourse between the United States and [the Indian] nation[s], is, by our constitution and laws, vested in the government of the United States.

>     .  .  .

> Over the years this Court has modified these principles in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized, but the basic . . . [principle] has remained. . . . Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them. . . . [W]hen Congress has wished the States to exercise . . . power [over reservation Indians] it has expressly granted them the jurisdiction [to do so].

*Williams v. Lee*, 358 U.S. 217, 218-21, 79 S. Ct. 269, 269-71 (1959) (internal citations and punctuation omitted). *Accord United States v. Mazurie*, 419 U.S. 544, 557, 95 S. Ct. 710,

716-17 (1975) (Indian tribes retain "attributes of sovereignty over both their members and their territory"); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S. Ct. 2578, 2583 (1980) ("Congress has broad power to regulate tribal affairs under the Indian Commerce Clause" of U.S. Const. art. I, § 8). We have thus similarly recognized that:

> Indian tribes maintain certain powers of self-government over reservation activities, such that states may not exercise jurisdiction regarding these areas of tribal government. The exclusive nature of Indian tribes' authority in this regard is based on two distinct grounds: (1) federal supremacy, and (2) tribal sovereignty.

*Skillen*, ¶¶ 13-14 (citing *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 344, 103 S. Ct. 2378, 2392 (1983) (holding that state hunting and fishing laws applicable to nonmembers on an Indian reservation was preempted by federal law and the tribe's own regulatory scheme), and *White Mountain Apache Tribe*, 448 U.S. at 151-53, 100 S. Ct. at 2587-88 (holding that comprehensive federal regulatory scheme regarding harvesting and sale of tribal timber preempted state taxation of logging and hauling company operations)).

¶24 In specific regard to tribal child custody jurisdiction, we have further recognized that:

> [i]f tribal sovereignty is to have any meaning at all at this juncture of history, it must necessarily include the right, *within its own boundaries and membership*, to provide for the care and upbringing of its young, a *sine qua-non* to the preservation of [tribal] identity.

*Skillen*, ¶ 58 (internal citations and punctuation omitted, emphasis added). Consequently, within the framework of the exclusive regulatory authority of Congress over Indian Tribes, the Supremacy Clause of the United States Constitution, and the residual sovereignty of Indian tribes, Montana courts may not exercise otherwise existing state law child custody

21

jurisdiction over a member Indian child, who resides on the reservation of his or her affiliated tribe with at least one member Indian parent, if the exercise of state jurisdiction is either preempted by federal law or would substantially infringe upon tribal sovereignty over the custody and rearing of member Indian children. *See Skillen*, ¶¶ 12-13 and 17. *Accord Big Spring*, ¶¶ 41-46 ("state may not assume civil jurisdiction or take regulatory action over Indian people or their territories within the boundaries of their reservations" if "the exercise of [state] jurisdiction" is either "preempted by federal law or . . . [would] infringe[] on tribal self government"); *White Mountain Apache Tribe*, 448 U.S. at 142-43, 100 S. Ct. at 2583 ("congressional authority and the semi-independent position of Indian tribes have given rise to two independent but related barriers to the assertion of state . . . authority over tribal reservations and members," i.e., whether "the exercise of such authority may be pre-empted by federal law" or would "infringe on the right of reservation Indians to make their own laws and be ruled by them"—internal citations and punctuation omitted).

      D. Threshold State Child Custody Jurisdiction vis-a-vis Exclusive Tribal Court
         Jurisdiction Here.

¶25    1. *Whether the District Court Amended the Prior Parenting Plan Without Subject Matter Jurisdiction, or Improperly Exercised State Subject Matter Jurisdiction, vis-à-vis the Sovereign Jurisdiction of the Blackfeet Tribal Court?*

¶26    As a preliminary state law matter here, the District Court had general state law subject matter jurisdiction under Mont. Const. art. VII, § 4(1), and § 3-5-302(1)(b)-(c), MCA, to hear and adjudicate Father's petition for modification of the parties' prior state law parenting plan under the substantive criteria specified in § 40-4-219, MCA. The

22

threshold state law question is then whether pertinent provisions of the state law UCCJEA nonetheless precluded exercise of that general state child custody jurisdiction as a non-discretionary matter of law under the circumstances of this case. In that regard, contrary to Mother's apparent UCCJEA "home state" analysis here, the alternative threshold interstate child custody jurisdiction prerequisites set forth in §§ 40-4-211(1) and 40-7-201, MCA, do not apply to Father's motion for a child custody "modification," as defined by § 40-7-103(3)(a) and (11), MCA, because those threshold UCCJEA criteria primarily apply only to "initial child custody determination[s]," as defined by § 40-7-103(3)(a) and (8), MCA. *See* §§ 40-7-103(7), -201, and 40-4-211(1), MCA.[10] In contrast, as to child custody modifications, the UCCJEA provides, as pertinent here, that "a court of this state that has [previously] made a child custody determination consistent with" the threshold UCCJEA jurisdictional prerequisites for an initial child custody determination "has exclusive[] continuing jurisdiction over th[at] determination until" a Montana court "determines" either that:

(1) "neither the child, the child and one parent, nor the child and a person acting as a parent have a *significant connection* with this state *and* that *substantial evidence* is *no longer available in this state* concerning the child's care, protection, training, and personal relationships"; or

---

[10] Section 40-7-203, MCA, incorporates the criteria of § 40-7-201(1)(a)-(b), MCA, by reference into the threshold UCCJEA jurisdictional requirements for a child custody modification but narrowly applies only to modification of a prior child custody determination of a "court of another state." Section 40-7-202(3), MCA, similarly incorporates the threshold jurisdiction criteria of § 40-7-201, MCA, to a modification of a prior child custody determination of that same court only when the court no longer has "exclusive, continuing jurisdiction" over the matter under the criteria of § 40-7-202(1), MCA.

23

(2) "neither the child, a parent, nor any person acting as a parent presently resides in this state."

Section § 40-7-202(1), MCA (emphasis added).

¶27 Based on Mother's November 2018 petition and the parties' subsequent stipulation, the District Court made the initial state law child custody/parenting plan determination regarding the subject child in January 2019. It is undisputed that, throughout that period of time, Mother was residing in Cut Bank, Montana, not on the Blackfeet Reservation. She thus does not dispute the validity of the District Court's exercise of state court child custody jurisdiction that resulted in the initial January 2019 parenting plan, as amended in November 2019 on the parties' stipulation regarding their mid-2019 cross-motions for contempt.

(A) Established Montana Place of Residence of Mother and Child.

¶28 The initial 2019 parenting plan, as amended, was still in effect when Father initiated this second state court parenting plan proceeding in February 2021 by filing a state court motion for a parenting plan amendment in response to Mother's earlier-filed February 2021 state court contempt motion.[11] Both parties thus again invoked the jurisdiction of the state court which then culminated, without jurisdictional challenge from either, in the contested state court evidentiary hearing on May 17, 2021, at which both were present and

---

[11] Father filed his February 2021 modification petition nine days after Mother filed a second contempt motion against him for refusing to return the child to her as scheduled based on his allegation that she failed to establish or maintain her sobriety as agreed in the stipulated resolution of the parties' 2019 cross-motions for contempt.

24

participated through counsel. In turn, the May 2021 evidentiary hearing then resulted, again without contemporaneous jurisdictional challenge, in the Standing Master's subsequent May 2021 judgment modifying the subject parenting plan by placing the child with Father, subject to Mother's specified visitation rights, pending restoration of an essentially co-equal parenting plan upon Mother's documented achievement and maintenance of her personal sobriety and establishment of a stable home.

¶29 As pertinent to her later jurisdictional challenge, Mother testified at the May 2021 hearing that she moved from Cut Bank to the Blackfeet Reservation in mid-2019, and thereafter continually resided on the Reservation, in or about Browning, Glacier County, Montana, except for a two month period when she was temporarily residing in North Dakota with a friend while working there. She testified, *inter alia*, that on one occasion after mid-2019, she stayed with one of her relatives on the Reservation for a period of eight months. On appeal, she thus asserts that, except for the time she temporarily lived in North Dakota, she has continually "lived [o]n" the Reservation "as early as the summer of 2019," or as of January 2020 at the latest.

¶30 Father testified, however, that Mother had not maintained a stable residence since January 2019. He essentially testified that, in contrast to thereafter establishing any particular residence on the Reservation, she was constantly moving around between frequent short-term stays at the homes of at least ten different family members or friends, whether on the Reservation or off-reservation in Cut Bank and North Dakota. Consistent with Father's testimony, the child's maternal grandmother similarly testified that, from the

25

time she left her Cut Bank apartment in mid-2019 through May 2021, Mother successively stayed with a multitude of friends and family members. She testified that Mother stayed at Grandmother's home "off and on" for "up to" "a year" and that the longest time that Mother stayed elsewhere was "[m]aybe six months." Grandmother further testified that she had not seen Mother "for five months" until at the May 2021 hearing and that the "longest place [Mother] stayed was at" the home of Grandmother's aunt and uncle "when . . . this case first came to court." Mother's initial testimony was further contradicted by her own subsequent testimony that, on at least one occasion after mid-2019, she left the reservation and returned to Cut Bank where she stayed at a friend's residence for a month or more.

¶31 Regardless of the disputed period of time in which L.D.C. was in Father's custody in excess of his allotted time under the parenting plan after October 2020, it is undisputed on the May 2021 hearing record that the child was properly in the custody and care of his Oneida Indian father off the Blackfeet Reservation in accordance with the January 2019 parenting plan for at least equal, if not greater, periods of time than with Mother between January 2019 and May 2021. There is further no evidence that L.D.C. was present, much less resident, on the reservation for any continuous period longer than a month.

¶32 Based on the May 2021 hearing record, the Standing Master accordingly found in his written findings of fact regarding the ultimately granted parenting plan modification that Mother "has not established a permanent residence for her to parent the child since shortly after" entry of the initial January 2019 parenting plan. In his subsequent June 2021

26

judgment denying Mother's May 2021 post-hearing/judgment motion for "transfer" of jurisdiction to the Blackfeet Tribal Court, the Master similarly found that Mother "still resides in Glacier County," whether on the Blackfeet Reservation or off. Regardless of conflicting testimony, both of the Standing Master's findings of fact were supported by substantial record evidence that Mother had established no fixed residence after leaving her Cut Bank apartment in mid-2019, and thereafter successively resided with a least ten different family members or friends for short intervals, both on the Blackfeet Reservation and off the reservation in North Dakota and in Cut Bank. In that regard, we are not definitely and firmly convinced, based on our independent review, that the Master misapprehended or was otherwise mistaken regarding the record evidence presented by the parties. The Master's pertinent findings of fact are thus not clearly erroneous.

¶33 As a matter of law, "[t]here may only be one residence" and a "residence cannot be lost until another is gained." Section 1-1-215(2)-(3), MCA. Determination of residence for purposes of the threshold state/tribal child custody jurisdiction analysis is generally a determination of fact based on the criteria specified in § 1-1-215, MCA, subject to review only for clear error. *See Skillen*, ¶¶ 71-72. *See also Kroehnke v. Gold Creek Mining Co.*, 102 Mont. 21, 26, 55 P.2d 678, 679 (1936) ("[t]he question as to place of residence of a given person is ordinarily one of fact"—citing *Chicago & N.W. Ry. Co. v. Ohle*, 117 U.S. 123, 6 S. Ct. 632 (1886)). Based on the evidentiary record presented by the parties, we hold that, in substantive essence, the Standing Master correctly found as a matter of fact that, as of the evidentiary hearing and resulting child custody judgment in May 2021,

27

Mother last resided in Glacier County, Montana, but had yet to establish a fixed and definite residence on the Blackfeet Reservation.[12]

(B) Continuing State Child Custody Jurisdiction under § 40-7-202, MCA.

¶34 In accordance with § 40-7-202, MCA, *supra*, a Montana court's continuing state law child custody jurisdiction over a child custody determination previously made by that court may be lost or extinguished on a finding of fact by that court, based on case-specific proof, satisfying either of the factual criteria specified in § 40-7-202(1)(a) or (b), MCA. Here, however, the Standing Master did not make any such finding or conclusion on the May 2021 hearing record that: (1) the child, or the child and one parent, no longer have any "significant connection with this state"; (2) "substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships" as pertinent to the disputed issues of fact on Father's motion for a parenting plan modification; or (3) "neither the child," nor "a parent," "presently resides in this state." Moreover, beyond cursory assertion based on L.D.C.'s status as a member Indian child and presence on the Blackfeet Reservation while in Mother's custody during a series of successive temporary stays at various places thereon under the prior January 2019 parenting plan, Mother made no particularized case-specific evidentiary showing, as of May 2021, sufficient to satisfy any of the criteria specified in § 40-7-202(1)(a) or (b), MCA.

---

[12] Regardless of the jurisdictional dynamic between the state of Montana and the Blackfeet Tribe, a tribal member who resides on an Indian Reservation within Montana has "dual status" as both a "state citizen" and a member of that tribe. *See In re Habeas Application of Bertelson*, 189 Mont. 524, 538, 617 P.2d 121, 129 (1980).

28

Accordingly, based on the essence of the Standing Master's supported findings of fact—that Mother had established no particular place of residence, as defined by § 1-1-215, MCA, on the Blackfeet Reservation, whether at the commencement of the second child custody proceeding in February 2021 or upon issuance of the Standing Master's resulting May 2021 custody determination—we hold that, as of May 2021, the District Court had continuing state law child custody jurisdiction under § 40-7-202(1), MCA, to modify the parties' prior state court parenting plan regarding L.D.C.

(C) Exclusive Sovereign Child Custody Jurisdiction of the Blackfeet Tribe.

¶35 A state district court may not exercise otherwise existing state law child custody jurisdiction over a member Indian child, and at least one member Indian parent, who reside on the affiliated Indian reservation if the exercise of such jurisdiction is either preempted by federal law or would substantially infringe upon the sovereignty of that tribe in regard to the custody and rearing of member Indian children. *See Skillen*, ¶¶ 12-13 and 17. *See also Big Spring*, ¶¶ 41-46, *and White Mountain Apache Tribe*, 448 U.S. at 142-43, 100 S. Ct. at 2583, *supra*. As to federal preemption, the only pertinent federal legislative schemes in the specific context of Indian child custody jurisdiction are the federal PKPA, *supra*, and the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-63. However, ICWA does not apply to child custody proceedings and determinations within the scope of §§ 40-4-112 through -234, MCA. *See* 25 U.S.C. §§ 1903(1), 1911, and 1912; *Skillen*, ¶ 34 (internal citations omitted). The PKPA is similarly inapplicable here by its terms. *See* 28 U.S.C. § 1738A(a) and (b)(8) (in re requirement for "states," not including Indian tribes,

to give full faith and credit to other state child custody determination and limitations on one state's modification of another state's child custody determination). *See similarly*, *Skillen*, ¶¶ 16, 25, and 32.[13] Nor are we aware of any other federal law that would preempt the exercise of state child custody jurisdiction under the circumstances of this case.[14]

¶36 Nonetheless, as previously noted, *supra*, Indian tribes have child custody jurisdiction within their residual sovereignty, independent of the laws of the United States and constituent States, regardless of the lack of federal preemption of competing state law jurisdiction. *Skillen*, ¶ 58 (the right of an Indian Tribe "to provide for the care and upbringing of its young" "within its own boundaries and membership" is a "*sine qua-non*" of residual tribal sovereignty—internal citations and punctuation omitted). In that regard,

---

[13] In regard to the preemptive effect of applicable federal laws regarding the exercise of state jurisdiction over Indian Tribes and their members, the Supreme Court has recognized that:

> [t]he unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law. Tribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other. The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law. . . . [T]his tradition is reflected and encouraged in a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency . . . . Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence.

*White Mountain Apache Tribe*, 448 U.S. at 143-44, 100 S. Ct. at 2583-84 (internal citations omitted).

[14] Nor has Montana accepted and assumed jurisdiction over the Blackfeet Tribe and reservation under 25 U.S.C. §§ 1321, 1322, and 1326 (federal authorization for state assumption of civil and criminal jurisdiction over Indian Tribes with tribal consent).

the Supreme Court has recognized that the chances of survival of distinct Indian tribes and culture:

> are significantly reduced if [Indian] children, the only real means for the transmission of . . . tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People. [Such occurrences] seriously undercut the tribes' ability to continue as self-governing communities. Probably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships.

*Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 34, 109 S. Ct. 1597, 1600-01 (1989) (quoting Congressional testimony in support of ICWA). Consequently,

> [exercise] of state court jurisdiction over . . . child custody disputes [involving Indian children] poses a substantial risk of conflicting decisions which potentially threaten a decline in tribal authority. Different cultural views of parental responsibility are likely to be reflected by the ultimate custody determinations of tribal and state courts. To assume jurisdiction based solely on the location of the child or his parents or of various activities is to ignore the importance of ethnic heritage and customs. Presumably the tribal court is better equipped to consider the ethnic identity as a factor in determining the child's welfare than . . . a state court.

*In re Habeas Application of Bertelson*, 189 Mont. 524, 539, 617 P.2d 121, 129 (1980). *Accord Skillen*, ¶ 62 (exercise of state jurisdiction in a child custody dispute involving a member Indian child and Indian parent who both reside on the affiliated Indian reservation "threatens . . . the tribe's political integrity . . . [and] welfare," "even though [the other parent is] a non-Indian who resides off the [r]eservation"); *Fisher v. Mont. Sixteenth Jud. Dist. Ct.*, 424 U.S. 382, 386-88, 96 S. Ct. 943, 946-47 (1976) (exercise of "[s]tate-court jurisdiction" over an Indian child and parents who are residents of an Indian reservation "would interfere with" the self-government powers of the affiliated tribe, as "exercised

31

through the [t]ribal [c]ourt," by subjecting a "dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves" and thus "creat[ing] a substantial risk of conflicting [child custody] adjudications . . . [and] caus[ing] a corresponding decline in . . . [Tribal] authority"). Accordingly, based on the residual sovereignty of Indian tribes and the presumptive best interests of affiliated Indian children, an Indian tribe, acting through its tribal court, has exclusive child custody jurisdiction vis-à-vis Montana district courts over a member Indian child and at least one member Indian parent who reside on the reservation of that tribe. *Skillen*, ¶¶ 55-63 (internal citations omitted).

¶37 Here, however, the Standing Master correctly found as a matter of fact that Mother had established no particular place on the Blackfeet Reservation as a definite fixed residence, as defined by § 1-1-215, MCA, whether at the commencement of the second child custody proceeding in February 2021 or upon issuance of the Standing Master's resulting May 2021 child custody determination amending the parties' prior state court parenting plan. We thus hold that, under the record factual circumstances in this case, the Blackfeet Tribe, through its tribal court, did *not* have exclusive child custody jurisdiction, as of May 2021, over the subject child and at least one parent vis-à-vis the District Court's continuing state jurisdiction under § 40-7-202(1), MCA.

E. Parental Custody Disputes Involving Indian Children Not Resident on the Reservation of that Tribe—Concurrent State and Tribal Jurisdiction.

¶38 When the subject member Indian child does *not* reside on the reservation of the affiliated tribe, the sovereignty of the tribe "is less at stake," and thus the exercise of state

32

child custody jurisdiction does not necessarily undermine tribal sovereignty. *Skillen*, ¶ 68. *See also Bertelson*, 189 Mont. at 532-40, 617 P.2d at 126-30 (noting that an Indian child may be "culturally disassociated from" his or her tribe "by the free choice" of parents, including at least one Indian parent, who are raising him or her "off the reservation without [significant] contacts to the tribal life" and thus "the child's best interests would probably be served by applying the concepts of parental fitness of the culture in which the child has been immersed"). Consequently, when a Montana court has state law subject matter jurisdiction regarding a child custody dispute involving an Indian child not residing on the reservation of the affiliated Indian tribe, the state and tribal court of that tribe have concurrent child custody jurisdiction over the matter. *Skillen*, ¶ 68.[15] However, due to the unique nature of residual tribal sovereignty and the related imperative tribal interest in preserving tribal sovereignty and culture, and consistent with related federal policies and interests in maintaining tribal independence and the integrity of Indian families, Montana courts may not "automatically" exercise state child custody jurisdiction in every child custody dispute in regard to which concurrent state/tribal jurisdiction exists. *Skillen*, ¶¶ 69-70 (citing *Bertelson*); *Bertelson*, 189 Mont. at 532-40, 617 P.2d at 126-30.

¶39 Before exercising concurrent state child custody jurisdiction over an Indian child in regard to the substantive criteria for determining child custody under §§ 40-4-212 through -234, MCA, Montana courts must "balance the state interest" in exercising concurrent

---

[15] Of course, the state court must also have personal jurisdiction over the parties in accordance with the Montana Rules of Civil Procedure.

jurisdiction against the competing "tribal interests in [Indian] child custody that go beyond reservation boundaries." *Bertelson*, 189 Mont. at 539-40, 617 P.2d at 129-30. *Accord Skillen*, ¶ 70 (citing *Bertelson*). As manifest in the substantive child custody determination criteria specified in §§ 40-4-212, -219, -227, and -228, MCA, and the interstate UCCJEA jurisdictional criteria specified in Title 40, ch. 7, parts 1-2, MCA,[16] the pertinent state interests include ensuring that child custody determinations are based on the case-specific best interests of each child, maintaining the continuity and stability of prior child custody determinations absent a substantial change in circumstances of the child, respecting the constitutional rights of parents, maintaining the integrity of family units, and avoiding multi-jurisdictional competition, conflict, and relitigation of child custody matters between Montana courts and those of other states and Indian tribes. On the other hand, consistent with federal policy interests in maintaining tribal independence and the integrity of Indian families, pertinent tribal interests in custody disputes involving a member Indian child who resides off the affiliated reservation include the preservation of tribal sovereignty to "decid[e] the custody of one of its members," preserving and perpetuating tribal culture, and the best interests of the particular Indian child based, *inter alia*, on the particular cultural and societal standards of the subject tribe and the child's ethnic and cultural identity and ties thereto. *Bertelson*, 189 Mont. at 539-40, 617 P.2d at 129-30.

---

[16] *See* Commission Comments, UCCJEA §§ 101 and 104 (NCCUSL 1997).

¶40 However, rather than separate checklist criteria requiring proof in every case, recognition and balancing of those pertinent state and tribal interests are necessarily a function of the ultimate case-specific factual question as to whether "it appears that the state's contacts with and interest in the child and the parties are more substantial than those of the [subject] tribe," *Bertelson*, 189 Mont. at 539, 617 P.2d at 130, under the totality of the circumstances including, *inter alia*:

(1)     whether the state court has "temporary emergency jurisdiction" in accordance with § 40-7-204, MCA;

(2)     whether the state court has "continuing [state] jurisdiction" under the criteria specified in § 40-7-202(1), MCA;

(3)     whether the tribal court has declined to exercise tribal jurisdiction over the matter (*see* § 40-7-201(1)(c), MCA);

(4)     whether § 40-7-107, MCA, precludes exercise of state jurisdiction because a "previously commenced" custody proceeding involving the child was pending in tribal court at the time of commencement of the state court proceeding;

(5)     the extent to which the Indian child and at least one of the custodial parents have a more significant connection with the state or the tribe as referenced in § 40-7-201(1)(b)(i), MCA;[17]

---

[17] This assessment must include consideration, *inter alia*, of "the child's ethnic and cultural identity" including "[t]he existence of tribal law or tribal customs relating to child care and custody in cases of this sort[,] the nature of the child's personal relationship with [his or her] [Indian] grandparents and [parent,] the child's assimilation into and adjustment to life in the tribe and on the reservation, the [Indian parent's] ethnic and cultural background and membership in or ties to the [subject tribe,] the length of the child's residence both on and off the [subject] reservation[,] the domicile and residence of the child's [non-Indian or tribal parent,] and the child's personal relationship with [the non-Indian or tribal parent]." *Skillen*, ¶ 70 (quoting *Bertelson*); *Bertelson*, 189 Mont. at 540, 617 P.2d at 130.

(6)     the extent to which substantial evidence concerning the child's care, protection, education, and personal relationships is available in the state or on the reservation as referenced in § 40-7-201(1)(b)(ii), MCA; and

(7)     whether the state court is "an inconvenient forum under the circumstances" and the tribal court is a "more appropriate forum" under the criteria specified in § 40-7-108, MCA.[18]

*See Skillen*, ¶ 70 (tailoring pertinent UCCJA considerations into tribal sovereignty impact analysis for purpose of assessing propriety of exercise of concurrent state child custody jurisdiction vis-à-vis tribal court jurisdiction—citing *Bertelson*); *Bertelson*, 189 Mont. at 539-40, 617 P.2d at 130 ("the trial court should look to the statutory guidelines" set forth in §§ 40-4-211, -107, and -108, MCA, of the now-superseded UCCJA "[i]n balancing the state and tribal interests"). To adequately consider those factors and make that ultimate case-specific factual determination, Montana courts must conduct a case-specific evidentiary hearing and make "substantive inquiry," with corresponding findings of fact and conclusions of law. *Bertelson*, 189 Mont. at 540, 617 P.2d at 130. *Accord Skillen*, ¶ 70 (citing *Bertelson*).

¶41     Here, it is difficult to fault the Standing Master for not conducting a threshold state/tribal court jurisdictional hearing and analysis at the May 2021 hearing preliminary to consideration of the substantive merits of Father's parenting plan modification motion. Both Mother's February 2021 contempt motion, and Father's responsive modification

---

[18] *See also* § 40-7-202(2), MCA, "a court of this state that has exclusive, continuing jurisdiction under this section [of the UCCJEA] may decline to exercise jurisdiction if the court determines that it is an inconvenient forum under [§] 40-7-108."

motion, voluntarily invoked the jurisdiction of the state court without contemporaneous jurisdictional challenge. However, while we appreciate the difficult situation in which courts find themselves when, as here, litigants fail to recognize and timely assert the need for a preliminary state/tribal jurisdictional assessment when implicated, it remains "incumbent on district courts operating in the vicinity of Indian Country to ascertain early" in custody disputes involving Indian children "whether jurisdiction exists," to avoid rendering a custody determination that is later subject to truncation, or invalidation on appeal, due to a lack or improper exercise of state subject matter jurisdiction vis-à-vis tribal jurisdiction. *See Big Spring*, ¶ 59. When a child custody proceeding under §§ 40-4-212 through -234, MCA, appears to involve a member Indian child, at least one member Indian parent, and "Indian Country," district courts have an independent duty to determine whether state child custody jurisdiction exists and, if so, is properly exercised, vis-à-vis tribal jurisdiction, "even in the absence of a challenge from a party." *See Big Spring*, ¶ 59 (internal Montana and federal citations omitted). Here, the record manifests that the Standing Master was well aware that Mother and the subject child were members of the Blackfeet Tribe and that there was a factual dispute as to whether Mother, and the child when in Mother's allotted parenting plan custody, resided on or off the Blackfeet Reservation at the time of the February 2021 commencement of the second child custody proceeding and resulting May 2021 hearing and decision thereon. Thus, regardless of Mother's failure to more timely challenge the existence or exercise of state law child custody jurisdiction in this matter, the Standing Master erroneously failed to make

37

"substantive inquiry," *sua sponte*, with corresponding findings of fact and conclusions of law regarding the threshold existence and proper exercise of state child custody jurisdiction vis-à-vis the sovereign jurisdiction of the Blackfeet Tribal Court. Nonetheless, based on the fundamental principle that the existence and proper application of state law child custody subject matter jurisdiction are subject to review at any time during the proceeding or on appeal, *see Gottlob*, ¶ 7; *Big Spring*, ¶ 23; *Skillen*, ¶¶ 9-10, we may, in our discretion, assess those non-waivable matters de novo based on the existing evidentiary record presented by the parties.[19]

¶42 As previously noted based on the Standing Master's findings of fact and underlying evidentiary record, Mother's last definite fixed residence as of May 2021 was off-reservation in Glacier County, and she had yet to establish another definite fixed place of residence, as defined by § 1-1-215, MCA, on the Blackfeet Reservation. Both of the subject parents are members of Indian tribes, albeit different tribes, who both willingly invoked and sought exercise of state court jurisdiction until after Mother was unhappy with the ultimate result. While Mother's failure to earlier assert tribal court jurisdiction did not effect a waiver of her subsequent jurisdictional challenge, her invocation of state court jurisdiction is at least some inferential factual indication as to which forum she and her

_____

[19] We may also, in our discretion, alternatively remand to the district court for further development of the pertinent factual record with corresponding findings of fact, conclusions of law, and determination regarding the existence and proper exercise of state child custody jurisdiction vis-à-vis tribal court jurisdiction under the case-specific circumstances. *Skillen*, ¶ 70; *Bertelson*, 189 Mont. at 539-41, 617 P.2d at 129-31. We see no valid, productive reason to do so, however, under the particular circumstances of this case.

able counsel believed to have then had the most substantial contacts with the child under the circumstances at that time.

¶43 Moreover, aside from her assertion that all of her "parenting time" with the child occurred on the Blackfeet Reservation since mid-2019, and during which L.D.C. "enjoyed time with [Mother] and extended family" and received "medical care" thereon, Mother made no showing of the existence of any particularly pertinent Blackfeet tribal childcare law or customs, much less a tribal law or custom which would be contravened or undermined by the exercise of concurrent state jurisdiction under the record circumstances of this case. Nor has Mother presented any evidence as to the extent to which the child had been assimilated into and has adjusted to Blackfeet tribal life and culture as of May 2021 in contrast to the nature and circumstances of the child's off-reservation life in Montana and while in the off-reservation custody and care of his Oneida Indian father. The evidentiary record further manifests that, at most, the child had no greater custodial, care-giving, familial, or cultural history and ties on or to the Blackfeet Reservation than off-reservation in Montana and while in the custody and care of his father. Other than the child's presence on the Blackfeet Reservation during her allotted parenting plan time, and cursory assertion in her briefing, Mother further presented no particularized evidence, whether in regard to the continuing state jurisdiction criteria of § 40-7-202(1)(a)-(b), MCA, or the inconvenient forum criteria specified in § 40-7-108, MCA, as tailored to the state/tribal custody dynamic specified in *Skillen* and *Bertelson*, that the child no longer had any "significant connection" with the State of Montana and state forum, that any evidence

39

pertinent to the disputed facts at issue in the May 2021 hearing was no longer readily available in the state forum outside the Blackfeet Reservation, or that the subject parenting plan dispute could be more "expeditiously" resolved in Blackfeet Tribal Court.

¶44    To the extent that the ultimate standard for the exercise of concurrent state court jurisdiction vis-à-vis tribal court jurisdiction is whether the state or tribal court has more substantial contacts with and interest in determining the custody of the subject Indian child under the case-specific circumstances, that standard is the ultimate indicator in this case as to whether the exercise of concurrent state court jurisdiction over L.D.C. would substantially impair or undermine the residual sovereignty of the Blackfeet Tribe in accordance with tribal law under the particular case-specific record circumstances at issue. In that regard, we note that, in the midst of her ongoing multi-year custody dispute with Father, Mother first attempted to invoke the child custody jurisdiction of the Blackfeet Tribal Court in 2019, but then dropped or did not further pursue it after the parties resolved their then-pending custody dispute in November 2019 by state court stipulation and consent judgment.  Then, in immediate and direct response to what she viewed as the unfavorable May 2021 state court parenting plan modification, she again attempted to invoke Blackfeet Tribal Court jurisdiction, admittedly to obtain a more favorable result, while state court review of the Standing Master's determination was still pending in district court on her appeal.    Again, however, she later stipulated in September 2021 to an indefinite continuance of the parallel tribal court proceeding.  Consequently, while the Blackfeet Tribal Court has not declined to exercise its jurisdiction in this matter, neither has it

proceeded to exercise it on two prior opportunities to date. In that regard, nothing in the Montana UCCJEA prevents or impairs the Tribal Court, in its discretion in accordance with Blackfeet tribal law, from yet exercising its independent sovereign child custody jurisdiction over L.D.C. going forward.

¶45 We agree that the Standing Master and District Court erroneously concluded that Mother waived her right to assert her tribal jurisdiction and related inconvenient forum objections by waiting until after she received an unfavorable result in state court, a seemingly sharp practice that we nonetheless do not condone. However, in accordance with the Standing Master's supported findings of fact regarding Mother's failure to establish a definite fixed residence on the Blackfeet Reservation as of the May 2021 hearing, and based on our independent review of the hearing record, we hold that the Standing Master did not abuse his discretion in exercising continuing and concurrent state jurisdiction to amend the subject parenting plan regarding L.D.C., nor in failing to earlier decline exercise of that jurisdiction as an inconvenient forum under the criteria specified in § 40-7-108, MCA, as tailored in *Skillen* and *Bertelson* to the state/tribal court child custody jurisdiction dynamic.[20]

---

[20] Even if, *arguendo*, Mother had made a sufficient evidentiary showing that the Blackfeet Tribe had more substantial case-specific contacts and interest in the custody of L.D.C. than the state forum, the resulting jurisdictional questions, in the absence of exclusive tribal court jurisdiction, were whether the Standing Master abused his *discretion* in exercising the concurrent state jurisdiction, or failing to earlier decline to exercise it as an inconvenient forum. *See* §§ 40-7-202(1) and -108, MCA; *Skillen*, ¶¶ 68-70 (citing *Bertelson* and pertinent provisions of the since-repealed UCCJA); *Bertelson*, 189 Mont. at 532 and 539-40; 617 P.2d at 126 and 129-30. Thus, even if, *arguendo*, the Standing Master abused his discretion in either regard, any such error was merely an abuse of discretion that would and could not, as a matter of law, have deprived the District Court of its concurrent state jurisdiction.

F.  Substantive State Law Criteria for Modification of Parties' Prior Parenting Plan.

¶46    2. *Whether the District Court Erroneously Amended the Prior Parenting Plan Without the Showing of a Substantial Change in Circumstances Required by § 40-4-219(1), MCA?*

¶47    Aside from her jurisdictional assertions of error, Mother asserts that the District Court further "erred when it concluded that there had been a substantial change in L.D.C.'s circumstances based on facts that were unknown at the time" of imposition of the prior parenting plan. She points, *inter alia*, to conflicting evidence countering Father's assertions of her continued substance abuse and her asserted reasonable explanation for her failure to establish a permanent residence for the parenting of the child while in her allotted parenting plan custody.

¶48    Upon finding the existence of a change in the circumstances of the child, based on "facts that have arisen since the prior plan or that were unknown to the court at the time of entry of the prior plan," and that amendment or modification is "necessary to serve the best interest of the child," a district court may amend or modify a previously imposed parenting plan. Section 40-4-219(1), MCA. Here, the Standing Master expressly found that "there [was] a substantial change in the circumstances of the [three-year-old] child" necessitating a parenting plan modification based, *inter alia*, on: (1) Mother's subsequent failure to "establish[] a permanent residence for" the parenting of the child; (2) her "continue[d] . . . substance abuse"; (3) her involvement in a "violent incident in July 2020 involving the child" and which occurred while she "was under the influence" of alcohol or drugs and resulted in her arrest; and (4) her then-recent failure, "for almost 24 hours," to notify Father

42

of a "medical emergency," requiring emergency medical treatment, involving the child while in her custody. When functioning as the finder of fact, trial courts have broad discretion to assess and determine the relative weight and credibility of evidence, particularly in the face of conflicting evidence. *In re Marriage of Horton*, 2004 MT 353, ¶ 11, 324 Mont. 382, 102 P.3d 1276; *Double AA Corp. v. Newland & Co.*, 273 Mont. 486, 494, 905 P.2d 138, 142 (1995). Despite conflicting evidence, the Master's findings of fact are supported by substantial evidence on the May 2021 hearing record and Mother has failed to demonstrate that the Master misapprehended the effect of the evidence or was otherwise mistaken. Accordingly, we hold that the District Court did not erroneously amend the parties' prior parenting plan without a showing of a substantial change in circumstances as required by § 40-4-219(1), MCA.

## CONCLUSION

¶49     Based on the Standing Master's pertinent findings of fact and supporting evidentiary record presented by the parties, we hold that, as of May 2021, the District Court, through its Standing Master, had continuing state law child custody jurisdiction under § 40-7-202(1), MCA, to modify the parties' prior state law parenting plan regarding L.D.C., and conversely, that the Blackfeet Tribe, through its tribal court, did *not* have exclusive child custody jurisdiction vis-à-vis that continuing state jurisdiction. We hold further that the Standing Master did not abuse his discretion in exercising the District Court's concurrent continuing state law jurisdiction under § 40-7-202(1), MCA, in May 2021, nor in failing to earlier decline exercise of that jurisdiction as an inconvenient forum

43

under the criteria specified in § 40-7-108, MCA, as tailored in *Skillen* and *Bertelson* to the state/tribal court child custody jurisdiction dynamic. We last hold that the Standing Master did not erroneously amend its prior state law parenting plan without the showing of a substantial change in the circumstances of the child required by § 40-4-219(1), MCA.

¶50 Affirmed.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ INGRID GUSTAFSON
/S/ JIM RICE

Justice Beth Baker, dissenting.

¶51 I would reverse the District Court on the jurisdictional issue, remand the case for an evidentiary hearing on that issue, and not reach Valerie's appeal of the amended parenting plan.

¶52 In *Marriage of Skillen*, we engaged in a "policy-based analysis of the UCCJA and the PKPA" to determine the district court's continuing jurisdiction over a child custody dispute involving an Indian parent because neither of those statutory schemes included Indian tribes in the definition of "state." *Skillen*, ¶ 23. Now, as the Court recognizes, the UCCJEA has fixed that statutory shortcoming. Section 40-7-135(2), MCA ("A court of this state shall treat a tribe as if it were a state of the United States for the purpose of applying . . . part 2 of this chapter."). There is one statute in Montana's UCCJEA that

governs resolution of the jurisdictional question at issue in this appeal, § 40-7-202, MCA. It provides, in pertinent part, that if a court of this state has properly made an initial child custody determination, that court has "exclusive, continuing jurisdiction over the determination until . . . a court of this state or a court of another state determines that neither the child, a parent, nor any person acting as a parent presently resides in this state." Section 40-7-202(1)(b), MCA. "[This statute is] neither arbitrary nor confusing. The statute unequivocally states that exclusive and continuing jurisdiction exists *until* a court in this state determines that none of the relevant parties reside in Montana." *In re B.P.*, 2008 MT 166, ¶ 19, 343 Mont. 345, 184 P.3d 334 (emphasis in original). Notwithstanding a parent's prior consent to proceeding in a Montana court, when a parent invokes this statute, the trial court is "obligated to apply" it, to make a determination, and—if the facts show that the parties do not reside in Montana—to relinquish jurisdiction. "Failure to do so constitutes an abuse of discretion." *In re B.P.*, ¶ 19.

¶53    The Court recognizes the District Court's erroneous reliance on Valerie's previous consent to, and invocation of, its jurisdiction in the parenting proceedings. Opinion, ¶¶ 41, 45. But it concludes that on "the existing evidentiary record" it is unnecessary to remand for further inquiry. *See* Opinion, ¶ 41, n.19. I disagree. First, Valerie expressly moved for a hearing on determination of jurisdiction under the UCCJEA. The District Court refused her request for improper reasons and then refused to allow evidence at the July 8 hearing. Second, the evidence presented at the May hearing is not

conclusive, and the facts the Standing Master found from that evidence are not determinative to the jurisdictional issue, which was not before the court at that time.

¶54     The Court reasons that the law allows a person only one place of residence, which is a question of fact "based on the criteria specified in § 1-1-215, MCA." Opinion, ¶ 33. This much is true. The Court overlooks, however, the very first "rule[] to be observed" in determining a person's place of residence: the place of residence is "the place where a person remains when not called elsewhere for labor or other special or temporary purpose and to which the person returns in seasons of repose." Section 1-1-215(1), MCA. The District Court did not hear evidence and did not make a determination on this or any other criteria of the statute. Evidence at the May hearing, however, suggests Valerie should have an opportunity to show that the Blackfeet Reservation is her place of residence.

¶55     Valerie testified that she went to North Dakota for approximately a one-month period of work when she was unable to find work on the Reservation. Other than an unspecified length of stay in Cut Bank with Kelly Fitzgerald, all the remaining evidence indicated that she was residing on the Reservation. Valerie testified, and her mother supported, that she was living with family members during all the time in question.[1] Of course, the May hearing was not held to determine jurisdiction, so this evidence was not developed. On appeal, Daniel does not appear to contest that Valerie lives on the Blackfeet Reservation, focusing primarily on the same irrelevant rationale he urged successfully in

_____

[1] Responding to a question from Daniel's counsel, Valerie's mother Teresa testified that "[a]ll the homes" Valerie stayed in were "stable" and that her daughters "rotate" to Teresa's bedridden mother's house to provide care.

46

the District Court—that she invoked Montana state court jurisdiction and consented to it until she did not get her way.

¶56 Both the Standing Master and the District Court misapprehended the issue. The Opinion notes that the Master "found that Mother 'still resides in Glacier County,' whether on the Blackfeet Reservation or off." Opinion, ¶ 32. For purposes of the UCCJEA, though, Mother's *residence on* the Blackfeet Reservation would be determinative. The Court gets around this problem by finding no clear error that Valerie "had yet to establish a fixed and definite residence on the Blackfeet Reservation." Opinion, ¶ 33. But § 40-7-202(1)(b), MCA, does not say a party must prove a "fixed" or "particular" household in the place where the party resides. *See* Opinion, ¶ 37. It requires a finding only that the parent does not "presently reside[] in this state." *See also* § 1-1-215(1), MCA. That is the inquiry the District Court must make. If Valerie resides on the Blackfeet Reservation, the inquiry is over, and the Tribal Court has jurisdiction.[2]

¶57 For these reasons, the Court should reverse the District Court's August 6, 2021 order and remand for an evidentiary hearing on Valerie's motion to transfer jurisdiction to the Blackfeet Tribal Court under § 40-7-202(1)(b), MCA. Finally, "[a] court of this state that has exclusive, continuing jurisdiction under this section may decline to exercise jurisdiction if the court determines that it is an inconvenient forum under 40-7-108."

---

[2] Daniel points to Valerie's filing of a child custody petition in Tribal Court to suggest nefarious forum-shopping for a more favorable outcome. In order for a court to relinquish jurisdiction under the UCCJEA, however, there must be a receiving court. *See In re A.R.B.*, 2013 MT 310, ¶ 19, 372 Mont. 274, 312 P.3d 425 (noting that "any obligation to relinquish jurisdiction to another court under the 'exclusive, continuing jurisdiction' provision of the UCCJEA requires a pending proceeding in the other state").

Section 40-7-202(2), MCA. Valerie's motion to transfer jurisdiction sought an inconvenient forum determination in the alternative, and the District Court refused her attempt to present evidence on the § 40-7-108 factors at the July hearing. If, on remand, Valerie's evidence fails to meet the requirements of subsection (1)(b), the District Court also must afford her the opportunity to present evidence—and Daniel to rebut that evidence—on whether the Ninth Judicial District Court presents an inconvenient forum under § 40-7-108, MCA.

/S/ BETH BAKER